**PENTHOUSE INTERNATIONAL, LTD., Plaintiff,**

**v.**

**Edward KOCH, the City of New York, Metropolitan Transportation Authority, New York City Transit Authority and New York Subways Advertising Co., Inc., Defendants.**

No. 84 Civ. 4737–CSH.

United States District Court, S.D. New York.

Dec. 19, 1984.

Grutman, Miller, Greenspoon, Hendler & Levin, New York City, for plaintiff; Norman R. Grutman, Jeffrey H. Daichman, Thomas V. Marino, New York City, of counsel.

Reavis & McGrath, New York City, for defendants; John A. Lowe, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is before the Court on cross-motions for summary judgment. Plaintiff, Penthouse International Ltd. ("Penthouse"), moves for partial summary judgment against three of the named defendants—New York City Subways Advertising Co., Inc. ("Subways"), New York City Transit Authority ("NYCTA") and Metropolitan Transit Authority ("MTA")—on the ground that defendants' removal of and refusal to display a Penthouse advertising poster in the New York City subway system violated its First and Fourteenth Amendment rights of free speech and equal protection. Penthouse further alleges that due to the tortious interference of MTA and NYCTA, Subways wrongfully breached its advertising contract with Penthouse. Plaintiff seeks a declaratory judgment and monetary damages for defendants' alleged wrongdoings.

The three defendants cross-move for judgment in their own favor on all claims on the ground that they rightfully prohibited display of the poster, which they term "offensive."

All parties agree that there are no disputed issues of material fact and that this action is ripe for disposition by partial summary judgment on the issue of liability.

## I. FACTS

MTA is a public benefit corporation, created by the Metropolitan Transportation Authority Act, N.Y.Pub.Auth.Law § 1260 et seq. (McKinney's 1982), which controls and regulates New York metropolitan area mass transportation systems. NYCTA, another public benefit corporation, N.Y.Pub. Auth.Law § 1200 et seq. (McKinney's 1982), is responsible for operation of the New York City rapid transit or subway system. In 1959, the NYCTA was given statutory authority to place advertisements on subway system property, or to "rent, have or otherwise sell the right to do so to any person, private or public," N.Y.Pub. Auth.Law § 1204, subd. 13–a. Pursuant to that authority, NYCTA entered into a contract with Subways, a private New York corporation, by which Subways agreed to act as NYCTA's agent in leasing advertising space in the subway system. The agreement contains a provision[1] permitting NYCTA to prohibit acceptance or demand removal by Subways of any advertisement deemed by NYCTA to be "offensive to good taste" or "objectionable to the Authority."

In exercise of the authority granted to it by that agreement, Subways entered into a contract dated November 21, 1983 with Tilley & Marlieb Advertising, Inc. on behalf of Penthouse, for the display of posters advertising Penthouse magazine in the New York City subway system. Subways

---

1. The contract provides, in Article Seven, paragraph four:

"The Contractor [Subways Advertising] agrees that no sign or advertisement displayed shall be or contain anything unlawful, immoral or offensive to good taste, and in that respect all advertising matter shall be subject to the approval of the Authority [NYCTA]. The Contractor also agrees that if any signs or advertisements are objectionable to the Authority, they will be removed immediately."

agreed to install up to 550 "one sheet station posters" for Penthouse for purposes of subway and bus shelter advertisements. The contract ran for a term of twelve months beginning on January 12, 1984, at a cost of $8,917.00 per month. Consistent with its contractual obligation to NYCTA, Subways' standard form lease contract with its own customers, including Penthouse, provides at Section 2E:

"All copy and design shall be subject to rejection or removal at any time if it is deemed offensive to good taste or is unsatisfactory to the New York City Transit Authority."

Penthouse is a monthly publication whose advertising strategy reflects the cyclical and short-lived nature of the product. Its poster advertisements are usually created from the cover of the next monthly issue to go on sale and its advertising campaign is scheduled to coincide with the appearance of the issue on newsstands. Numerous poster advertisements for Penthouse have been accepted and displayed by Subways, although some have been modified by Penthouse, at Subways' request, to "reduce nudity."[2]

On April 12, 1984, Penthouse[3] submitted a proof to Subways Advertising of a poster advertising the magazine's June issue. The poster featured a caricature of Walter Mondale by political cartoonist Uri Hofmekler. The figure, wearing a medallion labeled "ERA Yes" around his neck, was portrayed as an almost nude male "stripper", with female hands reaching up toward his unclothed thighs.

Because the poster had a sexual content, the proposed ad copy was reviewed by Marvin Schwartz, President of Subways.[4] Schwartz agreed to accept the proposed poster if a black banner or "snipe" were added covering the figure's midsection from abdomen to thigh.

Once Tilley & Marlieb had obtained the approval of Subways for the modified version of the poster, Penthouse ordered additional copies of the advertisement and delivered them to Subways for posting. On Thursday, May 10, 1984, employees of Subways began installing the posters, and continued installing them on Friday, May 11, 1984. By 6:30 p.m., approximately 20 to 30% of the posters had been mounted.

At that point, Robert Kiley, Chairman of the MTA, learned that the poster was being installed and displayed in the subway system. After determining that the poster was "offensive to good taste" and "objectionable", he ordered the removal of all posters already installed and prohibited further installation of the poster, pursuant to the NYCTA-Subways agreement.

Kiley's order was relayed to Schwartz that evening by Larry Levine, an MTA employee. By Monday, May 14, 1984, all of the Penthouse posters had been removed.

The next day, Penthouse filed suit in New York state court against the same defendants as in this action, seeking damages and an injunction directing defendants to replace all of the posters that had been removed and enjoining defendants from removing them again.[5] Plaintiff's motion for a preliminary injunction was denied by Justice Maresca on May 21, 1984 and the denial was affirmed without opinion by the Appellate Division, First Department, on June 28, 1984.

On July 3, 1984, Penthouse filed this action in federal court and simultaneously

---

2. Affidavit of Marvin Schwartz at 3 and Exhibit D.

3. Although all transactions on behalf of Penthouse were carried out by their advertising agency, Tilley & Marlieb, my use of the term "Penthouse" is meant to encompass actions taken by plaintiff itself or its agents.

4. Schwartz stated in his affidavit that he "frequently conduct[ed] an initial review of copy

which has a sexual content" and that he "generally look[ed] at each advertising copy submitted by Penthouse." There is no indication that this was an established managerial policy; it appears to have been more of an ad hoc personal practice by Schwartz.

5. *Penthouse Int'l., Ltd. v. Koch,* New York County Index No. 11499/84.

**1342**

sought to voluntarily discontinue the state court action by serving a notice of discontinuance on defendants. The discontinuance, however, was ineffective because it was served and filed more than twenty days after the service of Penthouse's complaint. New York C.P.L.R. 3217(a)(1). As a result, the state action is still pending.

## II. STAY OF PROCEEDINGS

▆▆ Defendants, MTA, NYCTA and Subways, have moved this Court for a stay of further proceedings in this action pending final resolution of the state court action. They argue that because the state action is a prior pending action on the same claims between the same parties,[6] this Court should exercise its discretion to stay all proceedings before it until the previous action is properly terminated. Defendants accuse plaintiff of forum shopping in hopes of finding a more sympathetic ear to its claims in federal court. They argue that such forum shopping should not be permitted unless the state court action is discontinued in accordance with the requirements of N.Y.C.P.L.R. 3217, which may require payment to defendants of their costs and expenses of defending the state court action. *Mandelbaum v. L.N. Magazine Distrib., Inc.*, 28 A.D.2d 680, 280 N.Y.S.2d 753 (2d Dep't 1967). Defendants candidly acknowledge that they have no real desire to stay in the New York state courts. They ask this Court to hold the case before it hostage in order to coerce plaintiff into properly discontinuing the state action and perhaps thereby to give defendants the financial satisfaction they seek. This I decline to do.

Defendants' counsel conceded at oral argument that he could initiate a request on his own in state court, after passage of time, to have the action dismissed there for want of prosecution. However, he said he knew of no provision by which he could then apply for the expenses for which he seeks reimbursement. He suggested that

his clients can get financial satisfaction only if this Court requires plaintiff to first discontinue this action in accordance with N.Y.C.P.L.R. 3217, as a condition of pursuing its claim here.

It is not the province of this Court to manipulate its own exercise of jurisdiction in an attempt to set in motion the state court's procedural mechanisms for defendants' benefit. Surely defendants can directly initiate whatever application is appropriate in the state court in order to bring their grievance before that court.

A stay by this Court, postponing resolution of the motions ripe for adjudication before it, would be improper in light of the central importance of plaintiff's constitutional claims in this litigation. Federal courts have the primary duty to decide federal constitutional issues, *Zwickler v. Koota*, 389 U.S. 241, 252, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967), and in the First Amendment area, the Supreme Court has severely limited the scope of the district court's discretion to abstain, *New York Civil Liberties Union, Inc. v. Acito*, 459 F.Supp. 75, 82 (S.D.N.Y.1978). In *Zwickler*, a federal district court was held to be in error for abstaining from ruling on a request for a declaratory judgment that a state criminal statute contravened the First Amendment by its overbreath. The Court emphasized that "Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." 389 U.S. at 248, 88 S.Ct. at 395.

Defendants' request for a stay is denied, and I proceed to consider the merits of the motions before me.

## III. BREACH OF CONTRACT

▆▆ Penthouse claims that the actions of the three defendants in removing and refusing to display plaintiff's posters constituted breach of contract. Penthouse further states that it has performed all of its

---

6. In the state court action, Penthouse sought damages and injunctive relief. In the federal action, Penthouse seeks damages, and declaratory relief with respect to the same constitutional claims on which injunctive relief was denied in the state court proceedings.

own contractual obligations, except as prevented from doing so by defendants' acts. It claims that it is therefore entitled to recover monetary damages for loss of revenue from sales of the June 1984 issue, as well as for injury to its good will, credibility and relationships with contributors, advertisers, creditors and other third parties.

The only defendant with whom Penthouse has a contractual relationship is Subways. Consequently, the removal of the poster could have constituted a breach of contract only by Subways, the sole defendant with whom Penthouse was in privity of contract.

Subways itself did not make the decision to remove or refuse to display the Penthouse posters. To the contrary, Subways accepted the poster once modified and had begun the installation process at the time it was directed by MTA and NYCTA to remove the Penthouse ads. Subways' actions were taken only at the direction and insistence of the MTA and pursuant to its contractual obligations to the NYCTA.[7]

Paragraph 5C of the contract between Penthouse and Subways provides:

"If there is any delay or failure by NYSA [Subways] to perform hereunder as the result of force mejeure, labor dispute, law, *governmental action or order* (including termination of transit franchise), or any other similar or dissimilar cause beyond NYSA's reasonable control, NYSA shall immediately notify the Agency/Advertiser. *This shall not constitute a breach of contract*, but the Agency/Advertiser shall be entitled, at its election, to either an extension of service, additional service, or credit, all on a pro rata basis." (Emphasis added)

Subways' failure to carry out its contractual obligations to Penthouse was due solely to governmental action or order and by the very terms of the contract such failure

does not constitute a breach of contract. Defendants' cross-motion for summary judgment on plaintiff's breach of contract claim is therefore granted.

## IV. TORTIOUS INTERFERENCE WITH CONTRACT

Penthouse also alleges a cause of action against defendants NYCTA and MTA for tortious interference with the contract between Penthouse and Subways because the rejection and removal of the Penthouse posters by Subways was at the direction and insistence of NYCTA and MTA.

Under New York law, a plaintiff claiming tortious interference with a contract must prove: (1) the existence of a valid contract; (2) defendants' knowledge of the contract; (3) defendants' intentional procurement of the breach of the contract; and (4) damages. *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97 (1956). An essential element of the case against defendants is therefore breach by Subways of its contract with Penthouse. Since there has been no such breach, there can be no claim of tortious interference with contract. *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 682–3 (2d Cir. 1983) (Pierce, J., concurring); *Jack L. Inselman & Co., Inc. v. FNB Financial Co.*, 41 N.Y.2d 1078, 396 N.Y.S.2d 347, 349, 364 N.E.2d 1119 (1977). Defendants' cross-motion for summary judgment on plaintiff's tort claim is also granted.

## V. CONSTITUTIONAL CLAIMS

I come now to the central issue in this case: did defendants violate plaintiff's First Amendment[8] rights by refusing to display the Penthouse advertisement within the New York City subway system on the ground that its content is "offensive"? Plaintiff claims that it was unfairly denied

---

7. See text of Article Seven, paragraph four in note 1, *supra*.

8. The First Amendment is applicable to the states through the Fourteenth Amendment. *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966). Although it

is more accurately plaintiff's Fourteenth Amendment rights that would be abridged by defendants' state action, I will discuss the claims of abridgement of plaintiff's freedom of speech in the conventional language of the First Amendment.

access to a public forum due to the political content of its message, and that this selective exclusion was not justified by any compelling state interest. Defendants respond that the Penthouse poster was of a wholly commercial nature and thus entitled to a lesser degree of First Amendment protection than political speech. They further assert that the Supreme Court in *Lehman v. Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), established that a municipal rapid transit system is not a First Amendment forum and that NYCTA's managerial decision to limit displays to "innocuous and less controversial" advertising "does not rise to the dignity of a First Amendment violation". 418 U.S. at 304.[9]

### A. Commercial or Political Speech

■ The threshold question that must be addressed is whether the Penthouse poster involves political speech or commercial speech. Although we are far beyond the days when commercial speech was deemed wholly outside the purview of the First Amendment, *Valentine v. Chrestensen,* 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942), there is still a "common sense distinction" that must be drawn between the most clear-cut examples of the two, *Central Hudson Gas-Elec. Corp. v. Public Service Comm.,* 447 U.S. 557, 564–67, 100 S.Ct. 2343, 2350–52, 65 L.Ed.2d 341 (1980), in recognition of the fact that commercial speech has been afforded "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). State action limiting or prohibiting purely commercial speech must be judged against a less stringent standard than if such action encroaches on purely political speech.

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

The distinction between commercial and political speech is not always clear-cut. The mere fact that the message appears in the form of a paid advertisement does not automatically mean that it must be considered "commercial" speech. There is an inherent overlap of commercial, social and political messages in such items as a "public relations" advertisement by an industrial manufacturer of defense-related equipment, or an advertisement for commercial abortion services available at a family planning clinic. *U.S. Southwest Africa/Namibia Trade & Cultural Council v. U.S.,* 708 F.2d 760, 769 (1983).

In *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), Justice Stewart tried to provide some guidance in this area by defining the difference between what he termed "commercial price and product advertising" on the one hand and "ideological communication" on the other. He explained that ideological expression, "be it oral, literary, pictorial, or theatrical, is integrally related to the exposition of thought—thought that may shape our concepts of the whole universe of man." Commercial price and product advertising, in contrast, "is confined to the promotion of specific goods and services." 425 U.S. at 779–80, 96 S.Ct. at 1834–35.

Defendants allege that the Penthouse poster in this case is mere commercial speech because its eye-catching caricature of Walter Mondale was designed only to sell Penthouse magazine, not to communicate a political idea or message. In support of this argument, defendants claim that Penthouse conceded in its state court action that the poster served no purpose after the issue of the magazine it promoted was no longer for sale on the newsstands. They suggest that if Penthouse were truly

---

**9.** Plaintiff's complaint alleges violations of its First and Fourteenth Amendment rights without specifying which rights it deemed abridged by defendants' actions. Although the introduction to its moving papers refers both to First Amendment and Equal Protection violations, no legal argument has been pressed in support of the Equal Protection claims. It appears that the claim has been abandoned. But regardless, I need not reach the Equal Protection issue in view of my disposition of the First Amendment claims.

engaged in political speech, its message would have remained timely until the presidential election in November and Penthouse would have continued to have an interest in having the poster displayed.

Defendants overlook the fact that plaintiff's complaint specifically requests a declaratory judgment declaring "that the defendants ... *have* a duty and obligation to install and display the poster which is the subject of this action" (emphasis added). Complaint at 8. This request for relief, contained in plaintiff's pleadings filed in July, 1984, negates any suggestion that plaintiff considered its message important and timely only in connection with the sale of the magazine's June issue.

In any event, Penthouse states that it chose Hofmekler's caricature for its poster to disseminate Hofmekler's satirical view of Mondale as pandering to his feminist supporters. Individuals may disagree whether such a characterization of Mondale is accurate or fair, but this pictorial expression of a thought is as clearly political speech as the famous caricatures of Nast and Herblock.

While the driving force behind Penthouse's lease of advertising space in the subway system and its display of the poster at issue was undoubtedly its desire to sell copies of the June issue of Penthouse magazine, the context in which Hofmekler's caricature appears—a paid commercial advertisement—does not deprive it of its political message and content. "The relationship of speech to the marketplace of products or of services does not make it valueless in the marketplace of ideas." *Bigelow v. Virginia*, 421 U.S. 809, 826, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975).

■ I conclude that the Penthouse poster involves political speech which is subject to the full panoply of the First Amendment's protection and will therefore assess defendants' actions in light of the appropriate standard for excluding noncommercial speech from public property.

### B. *The Subway System as a Public Forum*

The first question to be resolved is whether and to what extent the New York City subway system is a public forum, since "[t]he existence of a right of access to public property and the standard by which limitations upon such right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). In *Perry*, the Court divided public property into three categories for First Amendment purposes.

■ The first category, the traditional public forum, consists of property like parks and streets "which by long tradition or by government fiat have been devoted to assembly and debate". 460 U.S. at 44, 103 S.Ct. at 954. The state may place only two types of restrictions on expressive activity in the traditional public forum: (1) content-neutral time, place and manner regulations, or (2) content-based exclusions which are narrowly drawn to effectuate a compelling state interest. *Id.* at 45, 103 S.Ct. at 954.

■ The second category, the designated public forum, is one which the state has voluntarily opened for use by the public as a place for expressive activity. Government property may be designated a public forum for a limited purpose such as use by certain groups, *e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (student groups), or for the discussion of certain subjects, *e.g.*, *City of Madison Joint School District v. Wisconsin Public Employment Relations Comm.*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board business). *Perry*, 460 U.S. at 46, n. 7, 103 S.Ct. at 955 n. 7. As long as the open character of the forum continues, the state is bound by the same standard in regulating speech in a designated public forum as in a traditional public forum. *Id.* at 46, 103 S.Ct. at 955.

■ Public property which is not by tradition or designation a forum for public communication falls into a third category

which includes, for example, military bases, *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), or prisons, *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). The state may limit expressive activity in these "non-forums" to uses compatible with the public facilities' intended purposes "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's views." *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

 The standard to be used in measuring defendants' actions against plaintiff's First Amendment rights in the case at bar depends upon which *Perry* category the New York City subway system fits. The system covers more than 720 miles of track with 477 stations.[10] Each station has numerous entrances from the city streets. Many entrances, and even entire stations, are connected underground by passageways of varying lengths. These entrances and some of the passageways are open to the general public without payment of any fee. However, all members of the public must pay a fixed toll to gain entrance to the platforms where passengers can board the subway trains. The entrances, passageways and platforms are lined with the type of advertising displays at issue here.[11]

According to Subways' own promotional literature, over five million different adults pass through the subway's portals and walkways each year and wait on its platforms for an average of 14 minutes each trip. The literature proclaims that the "high average frequency of exposure because of the necessity of regular riding," combined with the substantial waiting time and lack of other colorful distractions for thousands of daily commuters, make the subway system a "veritable 'Niagara Falls' of buying power." [12]

The subway system is clearly not a traditional public forum like a park. It is not an appropriate site for a political rally or demonstration, or for soapbox speeches by individuals. But it is an appropriate site for passive expressive activity, as shown by some important characteristics it shares with traditional public forums.

The system is open to any member of the general public. Its physical design and the concomitant concentration and flow of people in its underground thoroughfares parallel those of the city streets above it. While its passageways may not be as broad and open as public streets, their more enclosed structure does not alter their fundamental character as corridors for the passage of people in transit. The subway station is not a destination in itself but is, at most, a way station. Individuals hurrying to catch a subway train who pass by an advertisement that does not interest them, or even offends them, may simply avert their eyes and move on, just as pedestrians on a city street.

 Subways and NYCTA themselves appear to believe that the subway passageways and platforms are an appropriate forum for public expressive activity. Through Subways, the NYCTA has specifically created advertising display cases throughout the system and reserved their use for those advertisers willing and able to pay the fee demanded. It has actively solicited the advertising public by promoting the subway system as an advertising medium, and has accepted a variety of commercial and political messages for display to its riders.[13] By these actions, the

---

10. Exhibit K to affidavit of Glenn Smith, employee of Tilley Marlieb Advertising, Inc.

11. The evidentiary record in this case contains no comprehensive physical description of the subway facilities. But as a long-time resident New Yorker who daily rides the New York City subway to work, I take judicial notice of the layout and physical characteristics of the system with which I have become fully familiar.

12. Exhibit K to affidavit of Glenn Smith.

13. Although the record fails to establish through concrete examples the breadth of diversity of previously displayed ads, defendants' uncontroverted Rule 3(g) statement of material facts declares that "[t]he MTA, NYCTA and Subways Advertising have in the past and continue to accept politically-oriented posters for display." Furthermore, it is undisputed that defendants accepted and displayed at least two other Pent-

NYCTA itself has made the subway system a designated public forum for the limited purpose of generating revenue through the display of public advertisements.

This conclusion is consistent with the Supreme Court's decision in *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). *Lehman* upheld the defendant city's decision to exclude all political advertising from "car card" spaces in its buses and streetcars while accepting commercial and public service-oriented ads. In a 5–4 decision, the Court found that the interior of the transit vehicles was not a traditional public forum suitable for public expressive activity due to the "risk of imposing upon a captive audience." 418 U.S. at 304, 94 S.Ct. at 2718. The Court consequently upheld the blanket exclusion of an entire class of potentially controversial advertising for the protection of confined bus riders from disturbing intrusions on their privacy.

The *Lehman* Court's concern for captive listeners is inapplicable to the case at bar. The Penthouse ads were never displayed inside of subway cars; they were always posted in the open public areas of the subway stations—the walls of the passageways and platforms.[14]

*Lehman* says only that the interiors of transit vehicles are not traditional First Amendment forums. However, *Perry* makes it clear that the transit authority may create a designated public forum for the advertising of commercial and political speech by the acceptance and display of such advertisements over a significant period of time. That is precisely what the NYCTA has done in this case.

Other courts that have considered the constitutionality of selective rejection of advertising materials by local transit authorities have concluded that the pattern and practice of soliciting, accepting and displaying such ads creates a designated public forum. *See, e.g., Planned Parenthood Assoc. v. Chicago Transit Authority*, 592 F.Supp. 544 (N.D.Ill.1984) (Chicago transit system designated a public forum for pro-abortion messages by opening its message space to other "controversial" public message advertisements); *Coalition for Abortion Rights v. Niagara Frontier Transp. Authority*, 584 F.Supp. 985, 989 (W.D.N.Y. 1984) (public bus company created a public forum for advertisements concerning abortion by permitting other political and public service advertisements); *Gay Activists Alliance of Washington, D.C., Inc. v. Washington Metro. Area Transit Authority*, No. 78–2217, slip op. (D.D.C. July 5, 1979) (interior of Washington, D.C. buses designated a public forum for message regarding homosexuality by transit authority's acceptance of other ads dealing with social and political issues); *Preterm, Inc. v. Massachusetts Bay Transp. Authority*, No. 74–159–M, slip op. (D.Mass. May 13, 1974) (injunctive relief granted for plaintiff likely to be able to prevail at trial on merits of complaint that by offering space on its facilities for public advertising, transit authority could not constitutionally refuse to carry pro-abortion advertisement). *See also, U.S. Southwest Africa/Namibia Trade & Cultural Council v. U.S.*, 708 F.2d 760, 767 (D.C.Cir.1983) (federally-owned airport a public forum for political advertising).

house advertising posters bearing political caricatures—one of Ronald Reagan and the other of Leonid Brezhnev. The Brezhnev poster, another Hofmekler creation, depicted the Soviet leader even more scantily clad than Walter Mondale in the poster here at issue.

**14.** Defendants note that the record in *Lehman* revealed that the Shaker Heights Rapid Transit System provided advertising space on the outside as well as the inside of its cars. 418 U.S. at 320, n. 12, 94 S.Ct. at 2725, n. 12 (Brennan, J. dissenting). They therefore assert that *Lehman* approved a ban on all political advertising whether located on the interior or exterior of the transit vehicles. But this argument cannot be sustained when the full text of the footnote in dissent is considered: The record reveals that the Shaker Heights Rapid Transit System provides advertising space on the outside as well as the inside of its cars. [citations deleted]. *Lehman* was denied access to both. Whatever applicability a "captive audience" theory may have to interior advertising, it simply cannot justify the city's refusal to rent Lehman exterior advertising space.

The parties do not cite, but I have considered the Second Circuit's recent opinion in *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767 (2d Cir.1984). *Gannett* arose out of the MTA's licensing scheme for the placement of coin operated newspaper vending machines (newsracks) in MTA commuter train stations. Plaintiff, a newspaper publisher, contended that MTA's imposition of revenue raising fees violated the First and Fourteenth Amendments. The district court agreed, enjoined the imposition of revenue raising fees, and ordered the adoption of reasonable standards governing license terms and procedures for license issuance. 579 F.Supp. 90 (S.D.N.Y.1984). The Court of Appeals reversed, rejecting the district court's holdings that MTA's imposition of revenue raising licensing fees necessarily violated the First Amendment, and that the licensing scheme was a prior restraint of the press. The Court of Appeals also saw no need to require the promulgation of guidelines at this time. The Court of Appeals remanded to the district court "with directions to enter an order prohibiting MTA from discriminating unreasonably in fees charged for licensing of newsracks, with any fees subsequently established to be applied retroactively on a non-discriminatory basis." 745 F.2d at 776.

During its discussion of the constitutional issues, Judge Meskill's discussion for the Court of Appeals in *Gannett* refers to the three *Perry* categories, and then says this:

"The third is '[p]ublic property which is not by tradition or designation a forum for public communication.' *Id.* 460 U.S. at 46, 103 S.Ct. at 955. The public areas of the MTA stations are in the third category. *See U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 864–66 (D.C.Cir.1983) (*Southwest Africa*) (holding public areas of airport in third category); *Fernandes v. Limmer*, 663 F.2d 619, 626 (5th Cir.1981) (same), *cert. dismissed*, 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982)." 745 F.2d at 772–73.

Taken at face value, this statement would appear to be contrary to the line of district court cases cited at pp. 19–20 of this opinion, concluding that a designated public forum (the second category under *Perry*) is created by transit authorities' solicitation and display of advertising material and I must of course display a deferential concern with the pronouncements of the Second Circuit on any issue.

But with all due deference, I cannot understand how the Second Circuit in *Gannett* derives authority for the statement that public areas of MTA stations belong in the third *Perry* category from the two cases cited for the proposition. Those cases are *Southwest Africa*, a decision of the Court of Appeals for the District of Columbia Circuit, and *Fernandes v. Limmer*, decided by the Fifth Circuit.

*Gannett* summarizes *Southwest Africa* as "holding public areas of airport in third category." As I read *Southwest Africa*, the Court of Appeals reached precisely the opposite conclusion. Officers of the Federal Aviation Administration refused to approve a particular advertisement as suitable for public display in various advertising areas at federally-owned airports. The Court of Appeals, reversing the district court, held that the refusal infringed upon First Amendment rights. The Court of Appeals stated at 708 F.2d 766:

"Whatever commonsense differences may exist in the forms of free speech allowable in airports, as opposed to parks and streets, an unusual consensus of judicial, legislative, and administrative opinion would classify *the public areas of National and Dulles squarely within the public forum family*. The district court's one-sided focus on the advertising display cases, without regard to the larger forum of which they are physically and functionally a part, distorts the first amendment realities of this particular medium of communication at these particular public places." (emphasis added).

*Fernandes v. Limmer*, the second case cited by the Second Circuit in *Gannett*,

dealt with a religious sect's suit to enjoin enforcement of an ordinance governing literature distribution and fund solicitation in the Dallas-Fort Worth Airport context. The Fifth Circuit, holding that the airport's blanket prohibition of solicitation and distribution inside its terminal buildings was overbroad because it unduly restricted First Amendment activity within a public forum, said this of the spaces in question:

> "It is now generally well established that airport terminals owned and administered by governmental entities are public forums in which efforts to regulate speech or religious activity must comport with First Amendment guarantees." 663 F.2d at 626.

*Fernandes* antedated *Perry*, whereas *Southwest Africa* came after *Perry* and cites it. 708 F.2d at 763. In any event, it is difficult to see how either case supports *Gannett*'s conclusion that the public areas of mass transportation facilities fall within a category of public property "which is not by tradition or designation a forum for public communication."

At least, I cannot accept that designation where, as in the case at bar, the MTA has actively solicited and published advertising in the public areas of the subways. And *Gannett* may be distinguished on its facts, since the newspaper publishers seeking to set up newsracks on commuter station platforms were not wooed by the MTA to do so; rather, the publishers approached the MTA and asked (or in the case of the plaintiff in *Gannett* demanded) that facilities be made available to them.

In any event, I do not read *Gannett* or its rationale as requiring me to depart from the clearly established line of authority which characterizes such public property, thus used, as a designated public forum for the display of paid public advertising. *See also Lebron v. Washington Metropolitan Area Transit Authority*, 749 F.2d 893 (D.C.Cir.1984) ("There is no doubt that the poster at issue here conveys a political message; nor is there a question that WMATA has converted its subway stations into public fora by accepting other political advertising.... Unlike *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), where the Supreme Court sustained a ban on all political advertising inside a city transit system, the Authority here, by accepting political advertising, has made its subway stations into public fora." Slip op. at 896, 896 n. 6.).

## C. *Content-Based Exclusion of Penthouse Poster*

 Having made the subway system a designated public forum for display of paid public advertising, defendants cannot discriminate among the advertisements they will display on the basis of content except to further a "compelling state interest," and then only by regulations that are "narrowly drawn" to effectuate that interest. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955.

There is no question that defendants rejected the Penthouse poster solely on the basis of its controversial content. But defendants advance three state interests to justify their actions: (1) that subway riders are a "captive audience" with a right "not to listen" to this type of speech; (2) that the advertisement "goes beyond the bounds of good taste and is offensive to the great majority of the general public served by the subway system," thus justifying its prohibition as a "public nuisance"; and (3) that school-age children who ride the subways daily need protection from "this patently offensive material." [15]

 I have already rejected defendants' first asserted interest as inapplicable on the facts of this case; there is no captive audience involved here.

 The only authority cited by defendants in support of their second asserted interest of preventing a public nuisance is *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). In *Kovacs*, the Supreme Court held constitutional a New Jersey ordinance prohibiting the use of sound trucks on public streets. The Court

---

**15.** Defendants' Memorandum of Law at 9–10.

upheld the regulation as a reasonable attempt to protect local citizens from loud and raucous broadcast intrusions into the privacy of their homes. The Penthouse poster has none of the loud and intrusive qualities of a sound truck; on the contrary, it is silent and passive. Furthermore, the poster cannot be prohibited as a public nuisance merely because it provokes disagreements and offends the sensibilities of the majority. "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). It is precisely this speech for which the protection of the First Amendment was intended. Even speech that is arguably in bad taste, so long as it does not cross the border into obscenity, enjoys the same constitutional protection as the most enlightened political discourse. Defendants' distaste for Penthouse's advertising style cannot, as a matter of law, constitute a compelling state interest that would justify the poster's rejection.

■ The third state interest asserted by defendants is protection of children from sexually suggestive pictorial displays. Defendants admit that the poster does not fall within the legal rubric of obscenity. However, they note that the state may adjust its definition of obscenity in order to more stringently control materials like the Penthouse poster that are displayed to minors, rather than exclusively to consenting adults, *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and imply that such was their aim here.

Shielding minors from graphic displays of sexually suggestive activity on publicly-owned property is no doubt a compelling state interest. Nevertheless, any restriction on expressive activity must be "truly necessary and finely tailored" to effectuate that state interest. *Southwest Africa, supra*, at 768. Even when seeking to protect minors, the state may bar public dissemination of protected materials only in "relatively narrow and well-defined circumstances." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975).

■ At a minimum, some objective criteria must exist to guide government officials in determining what sorts of things might arguably be obscene with regard to minors. The MTA & NYCTA may not arbitrarily and on an ad hoc basis determine that certain advertising materials are obscene for children and thereby take such materials out of the First Amendment's protection.

Defendants admit that they have previously displayed advertisements by Penthouse showing "attractive women in relative stages of undress or what-have-you"[16] and an advertisement bearing another Hofmekler caricature of Leonid Brezhnev attired only in a "G-string." But they distinguish the Mondale poster and their treatment of it on the ground that it is the only advertisement to "suggest overt sexual activity."[17] Yet defendants have never had a written policy stating that certain sexually suggestive materials can be displayed, but not those depicting overt sexual activity, nor have they sought to define explicitly the types of pictorial representations that would fall within the prohibited category.[18]

---

**16.** Transcript of oral argument on the cross-motions on August 1, 1984 at 33.

**17.** *Id.*

**18.** This is not a case like *Lehman* in which the transit authority had for 26 years, pursuant to city council action, excluded an entire class of advertising materials—all political or public issue advertising—from transit vehicles. *Lehman*, 418 U.S. at 300–301, 94 S.Ct. at 2715–16.

Defendants in this case have simply used their unfettered discretion to create ad hoc a particular sub-class of unacceptable ad copy within a larger class of advertising otherwise acceptable for display. That sub-class consists of only one item—the Penthouse poster. No evidence was proffered to show that any other proposed ad copy has ever been rejected by defendants for showing overt sexual activity.

At the time the Penthouse advertisement at bar was rejected, the only guideline for determining the acceptability of proposed advertisements was Section 2E of the Penthouse-Subways contract which barred ads "offensive to good taste or ... unsatisfactory to the New York City Transit Authority." This language is too vague and subjective to meaningfully circumscribe the discretion of subway officials. Without clear and reasonable objective criteria against which its employees may measure proposed ad copy, the MTA and NYCTA run the risk of arbitrarily censoring controversial political and social viewpoints. Such censorship "threatens a value at the very core of the First Amendment, the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open.'" *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 548 n. 9, 100 S.Ct. 2326, 2335 n. 9, 65 L.Ed.2d 319 (1980) (Stevens, J. concurring) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)).

Defendants' failure to promulgate and apply narrowly drawn objective standards for excluding the Penthouse advertisement from their designated public forum renders their actions in rejecting that advertisement violative of the First Amendment.

Plaintiff is entitled to a declaratory judgment consistent with this opinion. Settle judgment on five (5) days' notice.

If plaintiff wishes to press a claim for monetary relief, the parties are directed to proceed with discovery regarding plaintiff's remaining claims against defendants Koch and the City of New York in accordance with the scheduling order separately entered.

It is SO ORDERED.

* Together with Nos. B 82–3790, HM 82–3791, HM 82–3792, B 83–18, JH 83–19, K 83–20, M 83–21, M 83–22, HM 83–23, M 83–155, JH 83–157, B 83–158, HM 83–159, M 83–160, HM 83–161, M 83–162, HM 83–164, HM 83–165, M 83–167, HM 83–168, JH 83–169, B 83–1066, M 83–1713, B 83–2795, JH 83–4215, H 83–4216 and H 83–4328.