**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL and James F. Ritter, Plaintiffs–Appellants,**

v.

**DEPARTMENT OF AVIATION OF the CITY OF CHICAGO, City of Chicago, Eric Griggs, et al., Defendants–Appellees.**

**No. 94–1183.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1994.

Decided Jan. 27, 1995.

1146

Irving M. Friedman, Michael B. Erp, Harold A. Katz, Katz, Friedman, Schur & Eagle, Chicago, IL, Eugene B. Granof, James K. Lobsenz (argued), Air Line Pilots Ass'n, Washington, DC, for plaintiffs-appellants Air Line Pilots Assn, Intern., James F. Ritter.

Lawrence Rosenthal, DCC, Diane M. Pezanoski, Benna R. Solomon, Stuart D. Fullerton (argued), Susan S. Sher, Susan Herdina, Charles Wilfred Levesque, Office of Corp. Counsel, Appeals Div., Chicago, IL, for defendants-appellees Dept. of Aviation of City of Chicago, City of Chicago, Eric Griggs, David R. Mosena.

Paul M. Levy (argued), Stuart Berks, James Andrew Larson, Deutsch, Levy & Engel, Chicago, IL, for defendant-appellee Transportation Media Inc.

Before CUDAHY and FLAUM, Circuit Judges, and GRANT, District Judge.*

CUDAHY, Circuit Judge.

The Air Line Pilots Association brought this action under 42 U.S.C. §§ 1983, 1986 and 1988 seeking to compel the City of Chicago, its Department of Aviation and a manager of its advertising services, Transportation Media Incorporated, to display an advertisement in one of the diorama display cases in Chicago's O'Hare Airport. The complaint alleged that in its refusal to display the requested advertisement, the City and TMI violated the Air Line Pilots' First and Fourteenth Amendment rights. The district court disagreed and dismissed the Air Line Pilots' complaint, holding that O'Hare was not a public forum and that the City's restriction on political advertising was reasonable and not viewpoint discriminatory. Appealing from the dismissal of its complaint, the Air Line Pilots suggest that the district court incorrectly concluded that the relevant forum was the whole airport rather than the diorama display case itself. Because we agree with the Air Line Pilots, we vacate the district court's determination and remand the case for factual findings in accordance with this opinion.

## I.

The Air Line Pilots Association (ALPA) is the collective bargaining representative for the pilots of Air Wisconsin, Incorporated (Air Wisconsin). In this capacity, it sought to place an advertisement honoring the Air Wisconsin pilots in one of the diorama display cases at O'Hare Airport. The desired advertisement was critical of United Air Lines (United). It depicted the dismantling of an Air Wisconsin plane beneath a headline stating "It wasn't broke until they fixed it." Under the picture of the plane, a caption explains the claimed plight of the Air Wisconsin workers:

> Air Wisconsin employees built their company into one of the largest regional airlines in the nation, but UAL Corp. broke it into pieces and sold parts of it to others for its own benefit. Hundreds of Air Wisconsin employees lost their jobs. This advertisement is dedicated to the workers at Air Wisconsin and other airlines who have lost the ability to support their families because of corporate greed and indifference.

The bottom line of the diorama states that the ALPA, acting on behalf of the Air Wisconsin pilots, paid for the diorama.

The ALPA first began to investigate advertising space for the proposed display during the summer of 1993. In this respect, it contacted Transportation Media Incorporat-

---

* The Hon. Robert A. Grant, District Judge for the Northern District of Indiana, sitting by designa-

tion.

ed (TMI) about renting one of the O'Hare diorama display cases. About September 1, 1993, the ALPA entered into a contract with TMI. In return for $1,440, TMI agreed to display a diorama of unknown content in O'Hare's Concourse B for two months beginning September 7. The ALPA–TMI contract alluded to the City's role in the allocation of advertising space:

> Use of all advertising material is subject to approval by office of Commissioner of Aviation, City of Chicago, and subject to its orders of removal if deemed unaesthetic or objectionable for any reason whatsoever.

On September 20, 1993, when TMI was set to begin installation of the diorama, a representative of the City ordered TMI not to install it. TMI complied with the City's order. An attorney for the ALPA eventually requested an explanation for the failure to install the diorama. The Assistant Commissioner for the Department of Aviation suggested that United pays the City about $4,000,000 each year for advertising, and that United would not like the diorama. During that conversation, the City again refused to display the diorama.

The ALPA continued in its attempts to have the diorama displayed. Success seemed imminent on October 5 and 6, when the City informed the ALPA that it no longer objected to the display of the diorama. The diorama was in fact displayed on October 5. The display was short-lived, however. Only hours after the diorama went up, TMI removed it. TMI claimed that removal was occasioned by the rental of the display space to an unrelated third party.

At some later point, counsel for United wrote to TMI suggesting that the diorama should not be displayed because it was defamatory, illegal and not in good taste. The correspondence allegedly threatened TMI with litigation if it installed the display. The ALPA's remaining attempts to negotiate advertising space, including an offer to revise the diorama headline to read "Dismantled, but not forgotten," were not successful. On November 2, the ALPA brought suit alleging violations of its First and Fourteenth Amendment rights.

The ALPA sued both the City and TMI. O'Hare Airport is owned by the City of Chicago and administered by its Department of Aviation. The City and TMI enjoy a contractual relationship under which TMI agreed to operate the O'Hare Advertising Displays and Exhibit Concessions. Among other things, the contract gives TMI the authority to install, market and lease O'Hare's diorama display cases to advertisers willing to pay the required fee. The City receives 60 percent of the gross receipts derived from TMI's activities. The City–TMI contract also provides for the City's exercise of judgment in advertising displays:

> All advertising shall be in good taste and no advertising shall be accepted which, through its subject, content or presentation, is political, immoral or illegal. The Contractor understands under this contract the Commissioner of Aviation has reserved the right to disapprove any advertisement which is political, immoral, or illegal.

The precise content of the advertising displays is the source of some dispute. The ALPA asserts that the dioramas contain political, social, public interest and religious messages. TMI claims that the display cases have never been used for anything other than purely commercial advertisement. The City seems to admit that the display cases may have contained a "Save the Whales" advertisement. The District Court found that a Seventh Day Adventist message had been displayed.

The District Court, however, dismissed the ALPA's complaint for failure to state a claim upon which relief can be granted. It held first that O'Hare Airport was not itself a public forum. Therefore, it reasoned, any regulations regarding it need only be reasonable and not viewpoint discriminatory. The district court felt that prior cases legitimated the restriction on political advertising. It further held that no viewpoint discrimination occurred because all political advertisements were purportedly banned (i.e. there were no "pro-management" materials being displayed). The ALPA now appeals. For the reasons stated, we vacate and remand.

## II.

■ Our analysis of the constitutional issues involved here must begin with the determination that TMI's refusal to install the diorama was a product of state action.[1] The City contends that the ultimate refusal to install the diorama was TMI's. Its withdrawal of its objection to the advertisement, claims the City, should insulate it from constitutional liability for TMI's later act. Even if we believed that this ultimate refusal to display the diorama was TMI's alone, we would nevertheless find that the suppression of ALPA's diorama constituted the requisite state action. The admitted discretion that the City enjoys in accepting and refusing various advertisements renders this particular refusal an act of the state.

■ As a general rule, the conduct of private parties lies beyond the Constitution's scope. *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973); *Sherman v. Community Consolidated School Dist.*, 8 F.3d 1160, 1168 (7th Cir. 1993) (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 618, 111 S.Ct. 2077, 2082, 114 L.Ed.2d 660 (1991)). However, when governmental authority dominates an activity to such an extent that its participants must be deemed to act with the authority of the state, constitutional constraints apply. *Sherman*, 8 F.3d at 1168. Courts will find state action despite the presence of a private party in four discernible situations. *Id.* First, state action exists given a "symbiotic relationship" between the private actor and the state. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 721, 81 S.Ct. 856, 859, 6 L.Ed.2d 45 (1961). Second, the "nexus test" finds state action when the state commands or encourages the private discriminatory action. *See Rendell–Baker v. Kohn*, 457 U.S. 830, 840, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). A third situation sufficient to support a finding of state action occurs when a private party carries on a traditional public function. *Sherman*, 8 F.3d at 1168. Finally, state action is present when the involvement of governmental authority aggravates or contributes to the unlawful conduct. *Id.*

Of the four possibilities, only the first two are relevant here. We find that the City and TMI enjoy a level of interdependence with respect to the O'Hare display cases that renders a decision not to display an ad to be that of the City. *See Burton*, 365 U.S. at 725, 81 S.Ct. at 861 (noting the position of "interdependence"); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (suggesting that the proper focus is on "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself"). This is a largely fact-specific inquiry that examines the particulars of any relationship to locate the "nonobvious involvement of the State." *Id.* (quoting *Burton*, 365 U.S. at 722, 81 S.Ct. at 860). However we characterize the City's relationship with TMI, the City's involvement in the suppression of the diorama is sufficient to attribute that suppression to it.

The City participates in TMI's advertising activities at a general level. Both the City's contract with TMI and TMI's contract with the purchasers of advertising space allude to the City's discretionary authority to refuse advertising that it finds objectionable. In addition, the City pays for the illumination required to light the displays and bears the costs for any construction-related relocations of the displays. The City also provides office and storage space to TMI at no charge. The City has the contractual authority to review the employment qualifications and assignments of TMI personnel and to order their removal. The City is also entitled to 60% of all the revenues that TMI receives. This is direct evidence of the *joint enterprise* that *Burton* found so significant. 365 U.S. at 725, 81 S.Ct. at 861 (noting that "[t]he State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity").

---

1. The district court did not expressly rule on this issue. However, it necessarily concluded that state action existed in order to reach the specifics of the First Amendment claim.

■ If these factors were not sufficient, however, the record contains direct evidence of the City's stance on the proposed diorama. Put simply, the City was behind the first refusal to display the ALPA's proposed message. When asked why the diorama would not be displayed, the Assistant Commissioner of the Department of Aviation stated that United, the City's four-million-dollar-a-year advertiser, would be unhappy with it. The City therefore objected to the planned installation of the ALPA's message. Under its contractual grant of discretionary authority, it determined that the ALPA's proposed advertisement was objectionable. Pursuant to this determination, it prevented the message from being displayed. State action exists if the government "has exercised coercive power or has provided ... significant encouragement, either overt or covert," in effecting the challenged action. *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982)).

The contracts involved give the City complete discretion to exercise a veto over the content of advertising. These authorizations enabled the City to suppress the diorama. This is a much greater level of state involvement than the regulatory scheme that *Jackson* found insufficient to support a state action finding. 419 U.S. at 350, 95 S.Ct. at 453. Here, the City had both the express authority and the stated desire to influence the content of the display case. The City's antagonism to the proposed message was expressed on more than one occasion. Only later did the City withdraw its objection. At that point, TMI stepped in to claim responsibility for the second refusal to display the proposed diorama. Given the relationship between the City and TMI, it is impossible to sort out who *really* determined that the diorama should not be displayed. The reality is that *both* the City and TMI have professed an interest in avoiding the display of the message. The fact that TMI's refusal to display the diorama was last in time hardly alters this fact. Whatever the boundaries of the state action doctrine, it can hardly be used as a device for shifting the responsibility for challenged decision-making onto the shoulders of a private party.

The City and TMI, however, insist that no state action exists on the present record. Their arguments are of two varieties. First, TMI asserts that *Burton's* symbiotic relationship test should be strictly limited to the facts of that case. We have no occasion to define the parameters of *Burton's* holding here because, as indicated, the present record contains ample evidence that the City had both opportunity and motive to suppress the diorama. Even if we were to recognize that *Burton* has played a limited role in state action analysis in recent years, we would still find the nature of the City's relationship with TMI significant in determining whether its influence may have been exercised.

Second, TMI attempts to rebut our determination by construing our finding of state action on these facts as a much broader holding that TMI is a state actor for all purposes. We do not hold, however, that the mere fact of a mutually beneficial contract with the City renders TMI a state actor for all purposes. We merely hold that the refusal to display the diorama is the product of state action—given the fact that it arises out of a relationship in which *both* parties have an admitted interest and a stated hostility to the proposed message. If a third party wished to derogate TMI's conduct as a seller of soft drinks, a different analysis might be required.

The City and TMI share the common goal of utilizing O'Hare's advertising space for profit. The contract governing this activity memorializes the City's discretion in determining the content of the display cases. TMI's contracts with third party advertisers restate the City's power over content. The City in fact exercised that power in the present case. It cannot now evade responsibility for the suppression of the ALPA's proposed diorama.

### III.

Given that constitutional constraints apply to the challenged action, we must next determine whether the district court's opinion adequately respects First Amendment values.

The ALPA asserts a variety of errors in the district court's ruling. First, it contends that the district court erred in designating the airport concourses, rather than the diorama display cases, as the relevant forum for public forum analysis. Second, it asserts that the diorama display cases are a public forum. Third, it complains of the district court's failure to take its factual allegations as true for the purposes of a motion to dismiss. Finally, it asserts that the district court's reasonableness and viewpoint inquiries were flawed. We agree with many of its arguments and therefore vacate the district court's holding. However, the record does not at present contain facts sufficient to support a finding that the diorama display cases are a public forum for the purposes of constitutional inquiry. Therefore, we remand for factual findings in accordance with this opinion.

### A. The Public Forum

■ To determine whether a potential speaker has a right to use public property for expressive purposes, a court must first examine the nature of that property. A potential speaker's rights depend, in part, upon the type of government property that the speaker seeks to access. The First Amendment recognizes three distinct types of property. *See Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983); *Planned Parenthood Ass'n v. Chicago Transit Authority*, 767 F.2d 1225, 1231 (7th Cir.1985). The first category of property is the traditional public forum; this is an area, like a sidewalk or a public park, that has traditionally been used for expressive activity. *Perry*, 460 U.S. at 45, 103 S.Ct. at 954. A second category of public property is the designated public forum. These are areas that the government has dedicated to use by the public as places for expressive activity. *Id.* They may be opened generally for all expressive activity. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Or, they may be designated for more limited purposes such as use by certain groups, *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), or discussion of certain subjects, *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). The final category of property, of course, is the nonpublic forum. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

■ The standard of scrutiny to which a court subjects restrictions on speech depends on the type of property involved. In both traditional and designated public fora, the government may only enforce content-based exclusions of speech if there is a showing that the restriction is necessary to serve a compelling state interest and if the exclusions are narrowly drawn to achieve that end. *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 954–56. In nonpublic fora, on the other hand, restrictions on speech need only be reasonable and may not discriminate on the basis of viewpoint. *Id.* at 46, 103 S.Ct. at 955.

### B. Defining the Relevant Forum

■ Before applying these principles, however, we must identify the relevant forum. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985). The relevant forum is defined by focusing on "the access sought by the speaker." *Id.* at 801, 105 S.Ct. at 3448. If a speaker seeks "general access" to an entire piece of public property, then that property is the relevant forum. *Id.* If a speaker seeks a more limited access, however, then we must tailor our approach to ascertain "the perimeters of a forum within the confines of government property." *Id.* In *Cornelius*, for example, the relevant forum was not the federal workplace, but a more limited channel of communication within that workplace. *Id.*

Here, the ALPA seeks access to a diorama display case. That organization *does not* desire to use the greater airport concourse for purposes such as solicitation and the distribution of literature. *See, e.g., International Society for Krishna Consciousness v. Lee*, — U.S. —, —, 112 S.Ct. 2701, 2703, 120 L.Ed.2d 541 (1992) (holding that airport terminals are not public fora). Instead, it wishes only to use one of the display cases to

communicate its message. The limited nature of the ALPA's desired access renders the display case the relevant forum for the purpose of constitutional inquiry.

■ The district court nevertheless defined the relevant forum as the O'Hare concourse itself. This was error because the "forum should be defined in terms of the access sought by the speaker." *Cornelius,* 473 U.S. at 801, 105 S.Ct. at 3448. We do not suggest that the airport terminal's status as a nonpublic forum, *Lee,* —— U.S. ——, 112 S.Ct. 2701, is irrelevant to the public forum inquiry (a matter that we will discuss later in analyzing the nature of the forum). However, *Cornelius* teaches that forum analysis involves something more than locating the government's broad property interest. 473 U.S. at 801, 105 S.Ct. at 3448. Even given a conclusion that a piece of government property is not a public forum, channels for public communication—or alternative fora—may well exist *within* the greater piece of government property. This much is true here. Because the ALPA sought access to the advertising space and not to the airport as a whole, the advertising space is the proper focus of forum analysis. *See Lehman v. City of Shaker Heights,* 418 U.S. 298, 301–02, 94 S.Ct. 2714, 2716–17, 41 L.Ed.2d 770 (1974) (analyzing "car card space" and not public transportation system as a whole); *Planned Parenthood,* 767 F.2d at 1232 (analyzing Chicago Transit Authority advertising system and not greater transportation system).

C. *The Status of the Display Cases*

■ The designation of the relevant forum is only the first step in public forum analysis. We must next determine whether that forum is public, either traditional or designated, or whether it is nonpublic. *See generally Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–56. Here, it is undisputed that the display cases fail to qualify as a traditional public forum.

The parties do contest, however, whether the government has dedicated the display cases for expressive uses as a designated public forum. *See Perry,* 460 U.S. at 45, 103 S.Ct. at 954.

Determining whether government property has become a designated public forum requires an examination of the government's intent in establishing and maintaining the property. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448; *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1016 (D.C.Cir.1988). Inquiry into intent, however, is not merely a matter of deference to a stated purpose. Instead, intent is gleaned from an examination of two factors. First, we must look to the policy and practice of the government with respect to the underlying property. Second, we must examine the nature of the property and its compatibility with expressive activity. *Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–50.[2]

■ Determining the government's intent is an inherently factual inquiry that should not be resolved without due attention to an underlying record. *Stewart,* 863 F.2d at 1017–18; *see also Aids Action Comm. of Massachusetts, Inc. v. Massachusetts Bay Transp. Auth.,* 42 F.3d 1, 9 (1st Cir.1994). As the D.C. Circuit recognized in *Stewart:*

> ... the decision as to whether a forum is public usually invokes a factual inquiry. The forum doctrine itself is not a taxonomy of ideal types; it is virtually impossible in most cases to identify a public forum by legal inquiry alone, confined to the intrinsic nature of government actions or purposes.

863 F.2d at 1018. A district court must therefore develop findings on matters such as the forum's past uses, the government's *consistent* policy and practice and the forum's compatibility with expressive activity. *Id.* at 1017.

---

**2.** The City argues that something of a revision of this test should constrain our public forum analysis. It believes that the dispositive factors governing the public forum inquiry are: 1) whether the government requires permission to speak; 2) whether the government has contracted with a third party; 3) whether the message is inconsistent with the commercial enterprise; and 4)

whether the government is acting as a proprietor. While these factors may be relevant to forum analysis, a court is hardly compelled to consider these factors to the exclusion of all else. The factual inquiry that we mandate here is, as indicated, the means of discerning the government's intent as required by *Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–50.

Indeed, in light of this Circuit's holding in *Planned Parenthood,* 767 F.2d 1225, the factual particulars of the diorama display cases may well be dispositive. In *Planned Parenthood,* we held that the Chicago Transit Authority (CTA) bus advertising system had become a public forum because "CTA maintains no system of control over the advertisements it accepts for posting on its system." *Id.* at 1232. The record revealed a "laissez-faire policy," of allocating advertising space to almost anyone willing to pay the required fee (despite a purported policy of refusing controversial, vulgar or immoral ads). *Id.* In light of its willingness to accept almost any message, CTA was prohibited from arguing that public-issue advertising was incompatible with the primary use of the facilities. *Id.*

■ In fact, it was CTA's willingness to accommodate all advertisers that distinguished *Planned Parenthood* from *Lehman,* 418 U.S. 298, 94 S.Ct. 2714, which held that the advertising space inside city buses *was not* a public forum. In focusing on the differences between CTA's system and that at issue in *Lehman,* we noted that:

> Shaker Heights had a consistently-enforced written policy of rejecting all political and public-issue advertising, and in its twenty-six years of operation, the transit system had not permitted any political or public-issue advertising on its vehicles.... CTA has accepted political and public-issue advertising. Accordingly, *Lehman* is not controlling.

767 F.2d at 1233 (citations omitted). This factual focus is the only sensible way to reconcile *Planned Parenthood* with the command of *Lehman.*[3] Although it appears to

place an inordinate amount of weight on the particulars of a given case, past policy and practice has been similarly important in other circumstances. *See Lebron v. Washington Metro. Transit Auth.,* 749 F.2d 893, 896 (D.C.Cir.1984) (distinguishing *Lehman* because transit authority had accepted political advertising in the past); *Ysleta Federation of Teachers v. Ysleta School District,* 720 F.2d 1429, 1433 (5th Cir.1983) (holding that a school's internal mail system, unlike the internal mail system which the Supreme Court determined was not a public forum in *Perry,* was a public forum given the fact that the state had "opened the mail system to all employee organizations without distinction").

■ This factual inquiry into consistent policy and practice is necessary not only because it respects the established precedent of this Circuit, however. It also guards against the dangers of post-hoc policy formulation or the discretionary enforcement of an effectively inoperative policy. The government may not "create" a policy to implement its newly-discovered desire to suppress a particular message. *Hays County Guardian v. Supple,* 969 F.2d 111, 117–18 (5th Cir.1992) (noting that "a general policy of open access does not vanish" given an "anomalous departure" in restricting speech). Neither may the government invoke an otherwise unenforced policy to justify that suppression. *See Planned Parenthood,* 767 F.2d at 1228. Therefore, the government's stated policy, without more, is not dispositive with respect to the government's intent in a given forum.[4] The City's claimed ability to exclude "political" advertisements does not definitively settle the question of the display cases' status.[5]

---

3. The ALPA asks us to limit *Lehman* 's holding to situations involving captive audiences. Other courts have noted such a limitation. *See, e.g., Penthouse Int'l, Ltd. v. Koch,* 599 F.Supp. 1338, 1346–47 (S.D.N.Y.1984). We decline to so limit *Lehman* as a matter of law. *See, e.g., United States v. Kokinda,* 497 U.S. 720, 725–26, 110 S.Ct. 3115, 3118–19, 111 L.Ed.2d 571 (1990). At most, the captivity of an audience is relevant in determining whether the government intended to dedicate a given forum to expressive activity. *See Lehman,* 418 U.S. at 302, 94 S.Ct. at 2716 (suggesting that audience captivity is a consideration the legislature *may* have taken into account).

4. For a contrary suggestion, *see AIDS Action Committee,* 42 F.3d at 9 (suggesting, though not holding, that the very existence of a written policy may be a sufficient basis for finding that car interiors are not public fora).

5. The contract between the City and TMI actually bans "political, immoral or illegal" dioramas and dioramas "not in good taste." The district court correctly determined that taste and morality were standards too vague to be enforced. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969). We do not pass on the validity of "illegality" as a ground for banning a possible

Instead, a court must examine the *actual* policy—as gleaned from the *consistent* practice with regard to various speakers—to determine whether a state intended to create a designated public forum.

■ In holding that a general policy of open access would be dispositive under *Planned Parenthood*, we do not suggest that a state can "create a public forum by inaction." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449. If a state wishes to rely on a "policy" to demonstrate that it *has not* in fact opened a channel for expressive communication, however, that policy must be something more than a strategy adopted or relied upon for the purposes of litigation. A stated or paper policy, without more, does not negate public forum status. Objective indicia of intent are instead more telling in forum analysis. *Stewart*, 863 F.2d at 1019.

■ In the present case, these principles suggest that the district court's dismissal of the ALPA's complaint was erroneous. First, as noted, that court erred in determining the relevant forum for the purposes of analysis. But second—and more importantly—the district court also violated the unquestionable principle that the allegations of a complaint must be taken as true in ruling on a motion to dismiss. *Northwest Tissue Center v. Shalala*, 1 F.3d 522, 527 (7th Cir.1993). The district court refused to credit the ALPA's claim that the diorama display cases have contained political advertising in the past. Despite this allegation, the district court noted that "there is no indication defendants have ever accepted other political advertisements." Mem. Op. at 6–7. It apparently sought evidence of specific advertisements. The district court's demand for specifics was

improper because "complaints need not contain elaborate factual recitations." *Sanjuan v. American Board of Psychiatry & Neurology*, 40 F.3d 247, 251 (7th Cir.1994).

■ The district court also apparently relied on conclusions it had reached in a prior opinion denying the ALPA's request for a temporary restraining order. Mem.Op. at 6–7. While a district court may consider facts in addition to those alleged in the complaint, *Sanjuan*, 40 F.3d at 251, the TRO record did not contain facts sufficient to plead the ALPA out of court. The district court relied on the earlier record as proof of a negative—namely, that the diorama display cases had not contained political advertisements in the past.[6] Yet the TRO papers discussed only the 48 dioramas currently appearing in O'Hare's Concourse B. They neither alluded to advertisements appearing in other airport concourses or to those appearing in the past. These matters are quite relevant to the policy and practice at O'Hare airport. Because the ALPA, under the allegations of its complaint, was rather clearly able to prove facts that would entitle it to relief, dismissal was inappropriate. *See id. See also Stewart*, 863 F.2d at 1019 (noting that "[a]ppellants have clearly indicated enough in their complaint to suggest that such factual indicia [of intent] may come to light after discovery and trial" to withstand a motion to dismiss).

Identifying the City's intent in the present case raises inherently factual issues that should not be resolved on a motion to dismiss. *Id.* at 1018. We will therefore remand for proceedings in accordance with the rules established by *Planned Parenthood* and further clarified here.[7] We feel compelled, how-

---

message. Neither the City nor TMI relies on this content element in defense of its policy, and although the district court mentions it in ruling on the TRO, the district court did not rely on it in dismissing the complaint. Mem. Op. at 6–7 (looking instead to "political" as a valid restrictive content element).

6. The Record on Appeal contains no indication that the defendants sought summary judgment or that the district court converted the motion to dismiss into one for summary judgment. Even if this were the case, it would be error for the district court to convert a 12(b)(6) motion into one for summary judgment without giving notice

to the parties in light of the controverted factual matters involved. *Beam v. IPCO Corp.*, 838 F.2d 242, 245 (7th Cir.1988); *Farries v. Stanadyne*, 832 F.2d 374, 377–78 (7th Cir.1987).

7. To a large degree, the district court will be examining the past advertising practice and policy of the City and TMI. Given the parties' allegations, much of the inquiry will focus on whether or to what extent "political" advertisements have been permitted in the past. We warn the district court in advance that the content of the word "political" is not immediately obvious. That is, the term is not self-defining. While we believe that providing a static meaning for the

ever, to address a number of the parties' arguments suggesting that we determine forum status now, on appeal. We will therefore address the issues that the parties have raised under the test laid down in *Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–50.

### 1) *The Policy & Practice at O'Hare*

In light of the factual inquiry mandated by *Planned Parenthood*'s reading of *Lehman,* we are unable to determine the forum's status on appeal. *See also AIDS Action Committee,* 42 F.3d at 9. The record contains insufficient evidence of the City's consistent policy and practice regarding the acceptance of various messages. The past content of the display cases, for instance, is a subject of a substantial amount of dispute. The ALPA contends that the diorama display cases have contained political, social, public interest and religious messages. TMI, on the other hand, asserts that the display cases have never been used for anything other than purely commercial advertisement. The City seems to admit the existence of a "Save the Whales" advertisement. And the district court found that a Seventh Day Adventist message had been displayed at one point. Yet given the premature dismissal of the complaint, no one seems to know exactly what the various display cases have contained during the years of the City's contract with TMI.

Neither is there adequate indication of consistent enforcement of any City policy. Although TMI claims a policy of excluding "political" advertisements, there is no evidence that such a policy has ever been enforced. The record fails to reveal who exactly determines whether a given advertisement is prohibited as "political"; what standards this official adheres to in making this determination; or when and with regard to whom this determination has in fact been made. In fact, it is not clear to us that the City and TMI have done anything besides accept the ads of all who were willing to pay the fee. Without findings on these points, we cannot

term is impossible, we would advise the district court to be consistent in its use of the term when

engage in the analysis that *Planned Parenthood* requires. 767 F.2d at 1228–34.

■ The City evidently believes that these considerations are irrelevant in light of the fact that it charges users what it calls a "substantial fee" for space. Given this charge, the City asserts that access to the display cases is not unlimited. The charging of a fee, however, does not negate the possibility that the government has designated a public forum. *Planned Parenthood,* 767 F.2d at 1232 (noting that access to CTA's advertising system is "virtually guaranteed to anyone willing to pay the fee"). Despite the existence of a fee, the City may nevertheless have allowed indiscriminate use of the display cases by letting those cases to anyone willing to pay. This is the only access that the ALPA now seeks. Although it tendered the same fee required of all other advertisers, its money was refused because of the content of its message. The ALPA does not now ask the City to subsidize its message; nor does it suggest that the City should furnish space without charge to all who wish to erect a display. Therefore, the ALPA does not demand special access not previously accorded to other speakers. If the City has allowed all advertisers willing to pay its fee the indiscriminate use of its property, it cannot now argue that it maintains a policy of limited access. *Planned Parenthood,* 767 F.2d at 1232. The government need not completely subsidize expressive activity in order to create a public forum. *Id.*

As stated, examining the government's intent to determine whether a forum has been designated for expressive activity requires a factual inquiry into the policy and the practice of the government. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448. The necessity of this inquiry is not altered by the existence of a purported policy screening out the subject matter of the proposed message. *Stewart,* 863 F.2d at 1019. Neither is it affected by a demand that speakers pay for available space. *Planned Parenthood,* 767 F.2d at 1232. The record therefore fails to negate

comparing the earlier subject matter of the display cases to that which the ALPA now proposes.

the possibility that O'Hare's display cases are a public forum.[8]

### 2) *The Nature of the Forum & Its Compatibility With Expression*

■ The required inquiry also demands that a court focus on the nature of the forum and its compatibility with expressive activity. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448. In *Planned Parenthood*, we found this inquiry redundant in light of past practice. We stated that "since CTA already permits its facilities to be used for public-issue and political advertising, it cannot argue that such use is incompatible with the primary use of the facilities." 767 F.2d at 1232. Similar considerations apply here. The City and TMI claim to have a policy that prohibits "political" advertising. This is the purported basis for the suppression of the proposed diorama. On remand, if the district court finds that such a policy has not been consistently enforced, then this finding should be factored into the "incompatibility" inquiry mandated by *Cornelius*. In particular, if the diorama display cases have contained "political" or other public interest messages in the past, the City cannot now claim that those messages are incompatible with the purpose of the forum. *Planned Parenthood*, 767 F.2d at 1232.

Should the district court determine that the evidence of past practice is inconclusive, it will need to determine whether the type of expression that the ALPA proposes, an advertisement, is inconsistent with the nature of the forum. In this regard, we first note the weakness of any suggestion that a display case, in and of itself, is "incompatible" with expressive activity. By their very nature, the display cases are intended for communication. A number of courts have recognized as much. *See, e.g., Penthouse International, Ltd. v. Koch*, 599 F.Supp. 1338, 1346 (S.D.N.Y.1984).

■ This determination, however, hardly ends the inquiry. In discussing the nature of the property, a court cannot ignore the larger context. The advertising display cases are not discrete, self-contained forums wholly separate from the airport concourses in which they are located. *Southwest Africa v. United States*, 708 F.2d 760, 764 (D.C.Cir. 1983). *Cornelius* teaches as much. 473 U.S. at 805, 105 S.Ct. at 3450 (discussing the nature of the federal workplace); *see also United States v. Kokinda*, 497 U.S. 720, 727, 110 S.Ct. 3115, 3120, 111 L.Ed.2d 571 (1990) (holding that the "mere physical characteristics of the property cannot dictate forum analysis"). Neither can we ignore the commercial character of the property. *Lehman*, 418 U.S. at 303, 94 S.Ct. at 2717. Therefore, we would be remiss if we analyzed the display cases without reference to either the greater metropolitan airport or to their commercial purpose.

■ It is clear, after *Lee*, that airport terminals are not themselves public fora. —— U.S. ——, 112 S.Ct. 2701. This is so, in part, because "the purpose of the terminals [is] the facilitation of passenger air travel, not the promotion of expression." *Lee*, —— U.S. at ——, 112 S.Ct. at 2707. Given that the airport "must provide services attractive to the marketplace," the Supreme Court concluded that the Port Authority could not have intended to "designate a forum for solicitation and distribution activities"—in part because of the "disruptive effect" of solicitation on business. *Id.* at —— —— ——, 112 S.Ct. at 2707–08. These considerations are relevant here.

O'Hare's stated purpose is that of providing air travel to consumers. If there were any indication that the proposed type of expression—an advertisement—was incompatible with this purpose, that factor would be

---

**8.** In light of the absence of precise factual allegations, we believe it would be premature to address a number of the ALPA's additional arguments. Therefore, we do not determine whether the diorama display cases might be a public forum despite a consistent policy of excluding "political" advertisements. *See, e.g., Gay Student Services v. Texas A & M University*, 737 F.2d 1317, 1331–32 (5th Cir.1984) (holding that a university created a public forum despite its tra-

ditional refusal to recognize fraternal groups). Neither do we determine, contrary to the holding of *Lehman*, that a state cannot exclude political speech as a class—assuming a consistently enforced policy. *See, e.g., Metromedia v. San Diego*, 453 U.S. 490, 513, 101 S.Ct. 2882, 2895, 69 L.Ed.2d 800 (1981) (Justice White explained in a plurality opinion that a city choosing to tolerate billboards could not limit content to certain commercial messages).

relevant to whether the display cases were intended to have public forum status. *See, e.g., Cornelius,* 473 U.S. at 805–06, 105 S.Ct. at 3450–51 (noting the government's need to exercise control over access to a federal workplace to avoid interruptions of the performance of duties). However, there is no indication in the record that air travel would be disrupted by the type of expression that ALPA proposes (namely, an advertisement). The fact that paid advertisements are displayed in airport concourses does not alone threaten the vitality of air travel or the comfort of passengers.[9]

Neither is there an indication that permitting public interest groups to advertise would threaten the vitality of the City's commercial interests in deriving revenue from the advertising displays themselves. *See, e.g., Hubbard Broadcasting v. Metropolitan Sports,* 797 F.2d 552, 556 (8th Cir.1986). As already stated, the ALPA proposed to pay the same fee for the display that was required of all others; it was not asking the City to subsidize its speech—a matter clearly threatening the City's commercial interest. In addition, there is no evidence that a *general* allowance of political or public interest advertising would otherwise undermine TMI's ability to rent display cases. Only by imagining objections to particular viewpoints can any commercial inconvenience be conceived.

■ The present case provides an example. On appeal, the City adopts a position not expressly discussed before the trial court. Although it evidently relied on its ability to exclude "political" advertisements at trial (a position TMI still defends), the City now asserts a related argument—namely, that allowing this sort of communication would undermine the "commercial interests" of the *businesses* that utilize O'Hare (namely United), and that this is the reason it ought to be able to prohibit the message. In other words, the City claims a right to suppress the proposed message because United finds it objectionable.

We find this argument troubling in two different respects. First, it displays an objectionable degree of specificity. Only by reference to message viewpoint (i.e. criticism of a major airline) is the City's objection apparent. Although the City describes the category of speech that it wishes to prohibit as that creating "a hostile business environment," these terms have meaning only when considered in the context of the viewpoint that the ALPA wishes to express. *See, e.g., R.A.V. v. City of St. Paul, Minnesota,* — U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (holding that selectivity can "create . . . the possibility that the city is seeking to handicap the expression of particular ideas"). Aside from this, there is no indication that political or public interest messages would generally disrupt air travel services. In fact, one can imagine no disruption unless one imagines a particular advertiser's objection to a particular message. Here, for instance, the City's objection focuses on the fact that the viewpoint of the ALPA's message is disruptive. It may be that the City has never permitted speech critical of its airlines (though doubtless the City has permitted speech by the airlines designed to enhance competition among them). This factor does not negate the possible existence of a public forum, however. Unlike a consistently enforced prohibition on political speech, a claimed policy that enabled the City to prohibit the narrower category of speech critical of airlines would virtually guarantee discrimination.

Second, the suggestion that a particular message is inconsistent with the purposes of

---

**9.** It is important to note in this regard that we analyze the form of expression that a speaker proposes. *Lee* itself focused only upon the disruptions possibly caused by the proposed *forms of communication*—namely, solicitation and distribution. We save for another day any discussion that a particular message might disrupt air travel. Although the City attempts to invoke the specter of a plane's flaming wreckage (and its possible effect on passengers), we are not now confronted with the possibility that a particular

message might disrupt air travel. Instead, the ALPA wishes to display a picture of a plane being rather clearly *dismantled* by workers in cranes. At this point, we hardly consider the message objectionable from the average passenger's point of view; hence, the record apparently fails to present the question that a particular message might disrupt air travel by frightening passengers. Of course, the City is free to present evidence to the contrary.

a forum because of its content proves too much. On some level, every government actor desiring to suppress a message views that message as "incompatible" with one of its purposes (hence the desire to suppress). In *Widmar v. Vincent*, 454 U.S. 263, 265 & 268, 102 S.Ct. 269, 272 & 273, 70 L.Ed.2d 440 (1981), for instance, the state university doubtless felt that permitting religious speech within an otherwise open forum was incompatible with its mission as an arm of the state. This belief in the "incompatibility" of the message was not sufficient, however, to alter the policy of general access that the university otherwise kept in place. *Id.* The university's "policy evidenced a clear intent to create a public forum, notwithstanding [its] erroneous conclusion that the Establishment Clause required the exclusion of groups meeting for religious purposes." *Cornelius*, 473 U.S. at 802–03, 105 S.Ct. at 3449 (discussing *Widmar*). The City (or more pointedly, United) doubtless objects to the proposed message.[10] Nevertheless, such an objection is not a permissible basis for avoiding public forum status.

▆▆▆ The City also exaggerates the significance of its proprietary role at O'Hare. The fact that the government acts as a proprietor does not negate the need to engage in public forum inquiry. *Cornelius* itself conducted the factual analysis required by public forum inquiry despite the government's proprietary interest. 473 U.S. at 804–06, 105 S.Ct. at 3450–51. *See also Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 655, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981) (state fair); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975) (municipal theater). To be sure, the government's status as a proprietor is a factor entering into public forum analysis. *Lee*, ―― U.S. at ――, 112 S.Ct. at 2705. Proprietor status suggests, for instance, that the government has the power to define or restrict the use to which public property should be dedicated. *Id.* at ――, 112 S.Ct. at 2706. Therefore, in both *Lee* and *Kokinda*, 497 U.S. at 732–33, 110 S.Ct. at 3122–23, the fact that proposed

speech activities would have interfered with the designated use of the property suggested that the government never intended to dedicate the forum in question to the type of expression at issue. *See also Lehman*, 418 U.S. at 303, 94 S.Ct. at 2717 (discussing the city's commercial purpose of providing "rapid, convenient, pleasant, and inexpensive service"). A proprietary role is one factor to be considered in determining whether a public forum was intended. It is not, however, dispositive.

Determining whether the City intended to designate the advertising display cases as a public forum is a factual inquiry that the district court must conduct on remand. Under the rule of *Planned Parenthood*, the district court should focus primarily on the City's consistent practice and past policy in determining the City's intent. If the district court finds past policy and practice inconclusive, it must also examine, within the bounds prescribed by our analysis, whether the type of expression is incompatible with the nature of display cases in an airport concourse. Only then is a determination of the forum's status appropriate. If the district court concludes that the display cases constitute a public forum, the City's claim must fail unless it can demonstrate that the prohibition on political speech is narrowly tailored to meet a compelling state interest. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

### D. Reasonableness & Viewpoint Discrimination

Should the district court conclude that the advertising display cases are a nonpublic forum, then the restrictions on speech need only be reasonable and not an effort to suppress a speaker's views. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955. Although it is not certain that the district court will reach this inquiry on remand, we feel compelled to provide some general guidance to govern the district court's possible analysis.

In ruling on the motion to dismiss, the district court first determined that the City's restriction was reasonable because prohibitions on political speech in nonpublic fora

---

**10.** For a discussion of the ways in which an advertiser's preferences can corrupt the content

of different media, *see* C. Edwin Baker, *Advertising and A Democratic Press* 44–70 (1994).

were generally reasonable in light of *Lehman,* 418 U.S. 298, 94 S.Ct. 2714. Second, the court noted an absence of viewpoint discrimination because "all political advertisements are barred." Mem. Op. at 6. This cursory analysis is problematic in at least two respects.

 First, it fails to recognize that the reasonableness of a given restriction "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *International Society for Krishna Consciousness v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2711, 2712, 120 L.Ed.2d 541 (1992) (O'Connor, J., concurring) (quoting *Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3452). This inquiry requires an examination of both the governmental interest and the particular forum's nature and function. *Id.* The fact that *Lehman,* 418 U.S. at 303, 94 S.Ct. at 2717, upheld a policy of excluding political advertisements in public buses hardly determines the reasonableness of such a restriction for all time. Instead, the reasonableness of excluding political advertisements must be judged in light of the nature and purpose of the diorama display cases in an airport terminal.[11] Although this inquiry does not demand the "most reasonable" limitation, *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452, it does require a determination of whether the proposed conduct would "actually interfere" with the forum's stated purposes. *Multimedia Pub. v. Greenville–Spartanburg Airport,* 991 F.2d 154, 159 (4th Cir.1993). The district court improperly used *Lehman* to foreclose this inquiry.

 The second error in the district court's reasoning involves the appropriate focus for a viewpoint inquiry. The district court held that because all "political" advertisements had been barred, no viewpoint discrimination existed. This determination effectively avoided viewpoint inquiry by retreating to an exaggerated level of generality. The appropriate focus of the viewpoint inquiry examines whether the proposed speech dealt with a subject that was "otherwise permissible" in a given forum. *Lamb's Chapel v. Center Moriches School Dist.,* —— U.S. ——, ——, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993) (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451). The inquiry cannot be evaded by retreat to the category of speech allegedly banned (here, "political"). It may be that an entire category of speech is banned, but this hardly satisfies a viewpoint inquiry. *Lamb's Chapel,* —— U.S. at ——, 113 S.Ct. at 2147 (holding that, despite the fact that all religious speech was excluded, *excluding the religious viewpoint on a subject that was otherwise discussed was impermissible viewpoint discrimination*). It therefore matters little whether the entire category of "political" speech was prohibited.

A view labelled as "political" (presumably because it is controversial or challenges the status quo) may nevertheless exist in opposition to a view that has otherwise been included in a forum. The First Circuit has recently recognized as much. In *AIDS Action Committee,* that court invalidated the attempted suppression of condom ads that used sexual innuendo and double entendre to convey a message. 42 F.3d at 10. Concerns about viewpoint discrimination motivated the court's refusal to permit the ads' suppression. *Id.* In particular, the First Circuit noted that the transit authority there involved *had* displayed ads for a movie called "Fatal Instinct," which were "more overtly sexual and more blatantly exploitative" than the proposed condom advertisements. *Id.* at 11. The attempted exclusion of the condom ads was therefore motivated by impermissible viewpoint discrimination. *Id.* It was not material to the viewpoint inquiry that the proposed ads fell into the broader category of "public interest" advertising, while the movie ad was "commercial." [12]

11. We note that the City presses its alternative policy—that it has consistently banned advertisements disruptive of airlines and air travel—at this stage of analysis as well. That argument is inappropriate here for the same reasons we found it inappropriate above. Namely, it partakes of a level of selectivity that gives the appearance of hostility to the viewpoint that ALPA wishes to express. *See R.A.V.,* —— U.S. at ——– ——, 112 S.Ct. at 2547–48; *AIDS Action Committee,* 42 F.3d at 11.

12. To the extent that the court took notice of this fact, it held that the commercial advertisement was *less worthy* of protection. 42 F.3d at 10.

Indeed, we doubt whether broad categories of speech have much to do with a viewpoint inquiry. The line between commercial speech and political speech is far too tenuous to allow the distinction to do the work the district court would have it do in the instant case. As Justice Brennan noted in *Metromedia:*

> May the city decide that a United Automobile Workers billboard with the message "Be a patriot—do not buy Japanese-manufactured cars" is "commercial" and therefore forbid it? What if the same sign is placed by Chrysler?

453 U.S. at 539, 101 S.Ct. at 2908 (concurring). Justice Brennan's example, though addressing problems with the definition of commercial speech, points to the difficulty of relying on the exclusion of a category of speech to conclude that viewpoint concerns are absent. Namely, the same viewpoint can be endorsed by different speakers, for different purposes. Any analysis of allegations of viewpoint discrimination must recognize as much.

Therefore, in a future viewpoint inquiry, if necessary, the district court should not retreat into broader categories of speech with some imagined or hypothetical meaning. Instead, the proper focus concerns whether or not the forum has included speech on the same general subject matter. If this is the case, then suppression of a proposed but distinct view because of some content element included in it is impermissible.

## IV.

Given the City's discretionary authority over the content of advertising display cases, the suppression of the ALPA's proposed message constitutes state action and is subject to constitutional constraints. Constitutional analysis requires a foray into the public forum doctrine. On the present record, this is largely impossible. The district court incorrectly concluded that the airport terminal was the relevant forum. On remand, the district court must focus on the advertising display cases. An analysis of whether these display cases constitute a public forum requires an examination of the government's intent. This intent can be gleaned from the

policy and practice of the government, as well as from the nature of the forum and its compatibility with the proposed form of speech. Defense of a restriction in a public forum requires a showing that the restriction is narrowly tailored to further a compelling interest. If the district court reaches the opposite conclusion that the display cases constitute a nonpublic forum, however, it must nevertheless determine whether the restriction at issue is reasonable and viewpoint neutral.

The district court improperly dismissed the ALPA's complaint. On remand, it should conduct proceedings in accordance with the principles discussed in this opinion.

VACATED AND REMANDED.

FLAUM, Circuit Judge, concurring.

I agree with the majority's resolution of the state-action problem. The contract between Chicago and TMI gave the City the discretionary authority to refuse advertisers based on the content of their message, and ALPA's complaint clearly states that that authority was exercised. I also agree that the district court incorrectly determined that the Supreme Court's holding in *Intern. Soc. for Krishna Consciousness, Inc. v. Lee,* — U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), that airport terminals are not public fora mandated the conclusion that advertising spaces set aside in an airport could not be designated public fora. Consequently, as the majority holds, ALPA can succeed on its complaint if it can prove either that the advertising spaces are limited public fora and the "political" content prohibition is not narrowly tailored to serve a compelling state interest or that the City and TMI have engaged in impermissible viewpoint discrimination. I write separately to emphasize that even the potential determinations that the advertising display cases are a nonpublic forum and that there was no viewpoint discrimination would not necessarily resolve the issue in Chicago or TMI's favor.

Two factors on which the defendants rely bear comment. First, as the defendants note, Chicago has a legitimate and important interest in promoting the economic health

and productivity of O'Hare Airport. It is also true that "in cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum." *Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 804, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985). Second, the Supreme Court has indicated "that governmental actions are subject to a lower level of First Amendment scrutiny when 'the governmental function operating ... [is] not the power to regulate or license as lawmaker, ... but, rather, as proprietor, to manage [its] internal operation[s]. ...'" *United States v. Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) (citations omitted).

Both factors may, as the defendants urge, help push the advertising display cases from the designated public forum category into the nonpublic forum category. That we assign one designation or another to the display cases does not, however, alter their basic nature. When a space is open to advertising, to commercial speech, that fact indicates that the space is not only not disrupted by expressive activity but is conducive to such activity. Furthermore, when the government acts as a proprietor, it does act differently from when it exercises its traditional police powers and does deserve more leeway. But when the government decides who may speak based on substantive criteria, it acts as a censor. The government should not ordinarily take on the role of deciding who may speak on what matters, regardless of what capacity in which it acts.

Even in the nonpublic forum, restrictions on speech are permitted only if "reasonable" and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Lee,* —— U.S. ——, ——, 112 S.Ct. 2711, 2712 (O'Connor, J., concurring) (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)); *see also Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451 ("Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, ... or if he is not a member of class of speakers for whose especial benefit the forum was created, ... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."). The question then arises as to what is "reasonable."

The defendants make two arguments that they have reasonable grounds on which to forbid the advertisement. First, they assert a right to ban advertisements that would offend or undermine the commercial interests of the businesses that utilize O'Hare. As the majority notes, that argument rapidly devolves into a form of viewpoint-based discrimination. *See ante* at 1157. Once we determine that there is state action, the state actor may not serve as the handmaiden of private interests and justify a suppression of speech as a necessary appeal to those interests.

Second, the defendants assert that it is reasonable to ban political advertising simply in order to avoid the appearance of favoritism. *See Cornelius,* 473 U.S. at 809, 105 S.Ct. at 3452; *Lehman v. City of Shaker Heights,* 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality). That assertion oversimplifies First Amendment jurisprudence. In *Lehman,* the only position to command a majority was that the private advertisers who wished to place placards on buses had no right to subject a captive audience to their message. *Lehman,* at 302–06, 94 S.Ct. at 2717–18 (plurality); *id.* at 306, 94 S.Ct. at 2719 (Douglas, J., concurring). In *Lee,* what distinguished an impermissible ban on leafletting at airports from a permissible ban on solicitation of funds at airports was the intrusiveness of the respective activities. *See Lee,* —— U.S. at ——, 112 S.Ct. at 2713 (O'Connor, J., concurring); *id.* at ——, 112 S.Ct. at 2721 (Kennedy, J., concurring). A majority of the *Lee* Court squarely rejected the notion that the difficulties posed by leafletting, as opposed to solicitation, constituted even a "reasonable" restriction on speech. *See Lee v. Intern. Soc. for Krishna Consciousness, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2709, 2710, 120 L.Ed.2d 669 (1992) (*per curiam*) (companion case to *Lee*); *id.* (Rehn-

quist, C.J., dissenting). Similarly, in *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), the Court held that it was reasonable to forbid a political advocacy group from soliciting contributions and distributing information on the sidewalk in front of a post office during office hours. Four justices argued that the Postal Service's feared loss of customers because of the potentially unpleasant and especially intrusive situation created by solicitation made the restriction reasonable, *id.* at 735–36, 110 S.Ct. at 3124–25 (plurality), while Justice Kennedy concluded that the restriction was an acceptable content-neutral regulation of sidewalk. *Id.* at 739, 110 S.Ct. at 3126 (Kennedy, J., concurring). Finally, in *Cornelius*, the Court permitted restrictions on which charities could solicit funds through a campaign directed by the federal government at federal employees. *Cornelius*, 473 U.S. at 808–09, 105 S.Ct. at 3452–53. The Court did so on the grounds that it was reasonable to conclude, especially given supporting evidence, that including activist and advocacy-oriented charities along with more traditional charities would disrupt the campaign. *Id.* at 810–11, 105 S.Ct. at 3453–54.

These cases all seem to associate reasonable restrictions with some attempt to limit the intrusiveness of the speech, and I find it difficult to see, at the current stage of the proceedings, what intrusiveness permits banning the display of ALPA's advertisement. There is no suggestion that passengers will be slowed by such a display or that those who do not wish to look at the advertisements cannot avoid them by briefly averting their eyes as they walk past them. To the extent that TMI and Chicago rely solely on the political/nonpolitical distinction, it seems unlikely that a commercial advertisement for Penthouse Magazine would disrupt travel less than a political announcement exhorting people to "Get Out and Vote." Additionally, as the majority notes, distinctions between commercial speech and political speech are "far too tenuous" to do the work the defendants would have them do. *Ante* at 1159.

Indeed, if fear of disruption through political speech alone were sufficient grounds to restrict speech, it would almost follow that Chicago would have the right to ban all political speech at O'Hare. The facts of the instant case, as presented to date, exhibit none of the captive-audience or solicitation problems that typically justify subject-matter-based restrictions; their language should not be extended to apply here.[1]

Finally, independent of any forum analysis, we should be most cautious wherever a state actor undertakes to restrict political speech. As Judge Reynolds remarked in a slightly different context:

> It has often been stated that the essence of the First Amendment is the protection of political speech. If that be so, it is a strange policy indeed which exalts nonpartisan speech over political speech. Arguably, such an inversion of values ill serves the public upon whom falls the serious and challenging business of self-government.
>
> Moreover, the very terms "political" or "nonpartisan" are themselves insusceptible of principled application. Far too frequently the mantle of nonpartisanship is thrown over the shoulders of those who have been successful in obtaining political and economic power in our society, while the pejorative of "political" is reserved for those who have been less successful in those same endeavors. More obliquely (although no less perniciously), the appellation of nonpartisan is often affixed to ideas and values whose very emptiness of political content may itself be considered an expression of political position. What is "political" and what is "nonpartisan" must of necessity—as must beauty—lie in the eyes of the beholder. For that very reason, the Constitution will not allow such determinations to be made by government officials.

*Lawrence University Bicentennial Commission v. City of Appleton, Wisconsin*, 409 F.Supp. 1319, 1325 (E.D.Wis.1976). Political speech lies at the soul of the First Amend-

---

1. The defendants also rely on *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), in which the Court upheld a policy banning partisan political speeches and demonstrations on a military base. The special concerns of the military make this case unique and its holding of limited applicability in other First Amendment contexts.

ment, and we should be suspicious of any policy or practice directly aimed at limiting such expression.

Without question, it is useful to have categories of speech and government property. However, categorization also drives us to resolve issues without reflecting on why we reach certain results; the First Amendment is about more than taxonomy. In the present case, I doubt that the name assigned to the display cases matters very much. I believe that the restrictions on political advertising should be viewed with the utmost constitutional scrutiny.

The Court decides today that the district court too swiftly labeled the display cases a nonpublic forum and too readily decided that defendants had not engaged in viewpoint discrimination. I agree with both propositions.