**CHICAGO ACORN, et al., Plaintiffs,**

v.

**METROPOLITAN PIER AND EXPOSITION AUTHORITY, Defendant.**

**No. 96 C 4997.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 23, 1996.

Paul L. Strauss, Judson H. Miner, John F. Belcaster, Miner, Barnhill & Galland, Chicago, IL, for Local No. 880 Chicago Acorn, Seiu, Ted Thomas, John Donahue.

John Michael Touhy, Jonathan L. Marks, Julian C. D'Esposito, Jr., Julie L. Myers, Mayer, Brown & Platt, Chicago, IL, Peggy Anne Davis, Metropolitan Pier and Exposition Authority, Chicago, IL, for Exposition Authority.

## MEMORANDUM AND ORDER

MANNING, District Judge.

This matter comes before the court on the motion of plaintiffs, Chicago Acorn, SEIU Local No. 880, Ted Thomas and John Donahue, (hereinafter referred to as "plaintiffs"), requesting that this court grant a temporary restraining order allowing them to engage in a rally and protest at Navy Pier. This is a civil rights action brought pursuant to 42 U.S.C. Section 1983, 42 U.S.C. Section 1988, and 28 U.S.C. Section 2201, et seq. Plaintiffs' allege that their rights which are enumerated in the First Amendment to the United States Constitution are in great danger of being violated.

Plaintiffs are supporters of the Chicago Jobs and Living Wage Campaign, a movement which seeks to have the City of Chicago "adopt a municipal ordinance that would require city contractors and recipients of financial assistance pay their employees at least $7.60 per hour when they are employed on city contracts or projects receiving city assistance". Plaintiffs allege that the support of Chicago Mayor Richard M. Daley is crucial to the passage of the proposed ordinance. Thus, they wish to organize and protest, particularly directing their message to other Democratic party officials and mayors who support the Living Wage campaign in an effort to induce Mayor Daley to the bargaining table.

While the Democratic National Convention is scheduled to be held here in the city of Chicago, two related events are scheduled to be held at Navy Pier on August 24, 1996 and August 27, 1996. Mayor Daley is scheduled to attend both events. On August 24, 1996, a private media party is planned at which it is expected that no less than 25,000 persons will attend throughout the evening from 7:00 p.m. to 11:00 p.m. On that day, the Pier will close to the public at the conclusion of the Air and

Water Show and will not reopen until it is time for the party. The attendees will all be invited guests and will be equipped with credentials. It appears that no one will be allowed without these credentials. The public will be excluded from the Pier for this event. On August 27, 1996, a reception will be held in the Terrace A section of the Pier. On that day, the Pier will be open to the public as the reception is expected to have no more than 300 persons. Many of the guests will be members of the National Conference of Mayors, as well as other dignitaries. It is also conceivable that the Vice–President will appear at one or both of the events.

Accordingly on August 24, 1996, plaintiffs wish to organize and participate in a public demonstration. Specifically, plaintiffs have asked to demonstrate on sidewalks in front of Navy Pier, along the sides of Navy Pier, inside the mall area of Navy Pier, at the bottom steps that lead up to the Crystal Garden, without obstructing these steps, and at other external entrances that will be used to enter the Crystal Garden, without obstructing these entrances. Plaintiffs also desire to distribute written information about the Living Wage Ordinance, asserting that the Mayor has refused to support it, invite the press and other persons to attend a tour of the low-wage workplaces that would be affected by the proposed ordinance, carry signs and banners, sing and chant. Lastly, plaintiffs desire to hang banners from boats in the water near Navy Pier also protesting the Mayor's refusal to support the Living Wage Ordinance.

On August 27, 1996, plaintiffs also wish to organize and participate in a public demonstration. On this date, plaintiffs wish to utilize the sidewalks outside the Terrace A area of Navy Pier, without obstructing the entrances to Terrace A. Plaintiffs wish to distribute written information about the proposed Living Wage ordinance and the mayor's refusal to support it and invite the press, mayors and other persons to attend a tour of low-wage workplaces that would be affected by the proposed ordinance. Additionally, they wish to carry banners, sing, and chant. Again, they wish to hang banners from boats in the water near Navy Pier to protest the

Mayor's refusal to support the proposed Living Wage ordinance.

Navy Pier's policies and procedures provide that public demonstrations are prohibited without a permit granted by Navy Pier Management. Upon approval, the demonstration may occur only at the time, place and manner which is authorized by management.

ACORN's Field Director of Chicago, Madeline Talbott, testified that she was informed by staff at the Navy Pier on August 6, 1996 that the public areas of the Pier were reserved for the exclusive use of persons attending the welcoming reception for Democratic party officials. Plaintiffs sent a letter by telefax on August 7, 1996 to legal counsel for the Pier Authority describing their plans to hold protests at the Pier on these aforementioned dates. In that letter, plaintiffs reference information they allegedly received from an individual at Navy Pier's information booth, which indicated that their requests to protest would not be honored. Thus, Talbott contacted defendant's legal counsel, asking for reassurance that they would indeed be allowed to protest in the fashion described in the letter. On August 8, 1996, during a telephone conversation initiated by Talbott, the Director of Marketing at Navy Pier, Louise Sloan, told Talbott that the internal mall space of the Pier has been open to the public for charitable solicitation by some groups in the past. The record is clear, however, supporting the fact that plaintiffs still have not received a reply from defendants.

Plaintiffs bring this action seeking declaratory and injunctive relief seeking to bar defendant from banning plaintiffs' expressive activities at the Pier. Plaintiffs also request injunctive relief which orders defendants to allow such activity, and to adopt and implement neutral time and place restrictions. Plaintiffs assert that a temporary restraining order is needed in this case to prevent their first amendment rights from being violated.

In response, defendant Metropolitan and Pier Exposition Authority (hereinafter referred to as "defendant"), asserts that Navy Pier is not a public forum for the purposes of the First Amendment. Instead, defendant

asserts that Navy Pier is a commercial and recreational center, which welcomes the public for the limited purpose of shopping, dining and entertainment. Because Navy Pier is not devoted to public assembly or debate, defendant asserts that its suggestion, which recommends that plaintiffs protest outside the South Dock entryway and in Gateway Park, directly across the street from the main access points, is reasonable and constitutionally permissible for a nonpublic forum. As an affirmative defense, defendants assert that plaintiffs failed to follow the established permit procedure to obtaining approval to demonstrate.

This court conducted an evidentiary hearing on the matter on August 20, 1996 and based upon the evidence presented, the written submissions and arguments of the parties, the motion for temporary restraining order is granted in part.

## I. The First Amendment

Freedom of speech has been recognized as one of the preeminent rights of Western democratic theory, the touchstone of individual liberty. In fact, Justice Cardozo characterized it as "... the matrix, the indispensable condition of nearly every other form of freedom." *Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Justice Holmes observed, "... it is ... not free thought for those who agree with us, but freedom for the thought that we hate," which gives the theory its most enduring value. *United States v. Schwimmer*, 279 U.S. 644–45, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929) *(dissenting opinion)*.

While there is an ongoing debate over whether political speech should be the exclusive concern of the First Amendment, there is no dispute that it is one of the First Amendment's primary concerns. That is, whatever differences that may exist about the interpretations of the First Amendment, almost universal agreement supports the conclusion that a major purpose of the amendment is the protection of free discussion regarding governmental affairs. "... [S]peech concerning public affairs is more than self-expression, it is the essence of self-government". *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964).

The first amendment "bars the state from imposing upon its citizens an authoritative vision of truth. It forbids the state from interfering with the communicative processes through which its citizens exercise and prepare to exercise their rights of self-government. And the amendment shields those who would "censure the state or expose its abuses". *Herbert v. Lando*, 441 U.S. 153, 184–85, 99 S.Ct. 1635, 1653, 60 L.Ed.2d 115 (1979). In the words of Justice Brennan, "the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government". *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587, 100 S.Ct. 2814, 2833, 65 L.Ed.2d 973 (1980). It is with this historical background of the First Amendment that we must view the case before us.

Before this federal court can decide whether defendant can be enjoined from prohibiting plaintiffs' speech on its premises, we are bound by a two-step inquiry established by the United States Supreme Court. It is clear that the constitution restricts the power of the government to regulate speech. *See e.g., Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973). Yet, in order for this premise to apply to any case, it must be established that the entity at issue is a governmental entity sufficient for the application of constitutional standards. First, we must establish that defendant in this case should be held to constitutional standards when it attempts to regulate plaintiffs' activity on its premises. *See Hudgens v. National Labor Relations Board*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) *(absence of state action precludes application of constitutional standards)*. If so, the court must characterize the forum at issue, in order to determine the constitutional standards by which defendant's regulations and restrictions are to be judged. *See Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985)

*(scope of right of expression is determined by type of forum involved).*

Generally, state actors are subject to constitutional requirements. However, the conduct of private parties generally lies beyond the constitution's scope. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973). While the principle of "state action" may be "easily stated, the question of whether particular ... conduct is private, on the one hand, or amounts to 'state action' on the other, frequently admits of no easy answer". *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972). In some cases, conduct that is formally private may become so impregnated with a "governmental character" that it can be regarded as governmental action.

This is why this circuit has established four instances where the court will find state action sufficient to apply constitutional standards, despite the presence of a private party. In these cases, the governmental authority has dominated activity to such an extent that its participants must be deemed to act "with the authority of the state" sufficient for constitutional standards to apply. *Sherman v. Community Consolidated School Dist.,* 8 F.3d 1160, 1168 (7th Cir.1993). State action exists when there is a "symbiotic relationship" between the private actor and the state. *See Burton v. Wilmington Parking Authority,* 365 U.S. 715, 721, 81 S.Ct. 856, 859, 6 L.Ed.2d 45 (1961). Pursuant to the "nexus test", state action exists when the state commands or encourages private discriminatory action. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). State action also exists when a private party performs on a traditionally public function. *Sherman,* 8 F.3d at 1168. Last, state action is present when the involvement of governmental authority aggravates or contributes to the unlawful conduct. *Sherman,* 8 F.3d at 1168. Determination of these factors is largely a fact-specific inquiry that examines the particulars of the relationship of the state to the alleged private entity. *See Burton,* 365 U.S. at 725, 81 S.Ct. at 861–62.

If the court determines that state action exists, the first threshold has been met. In this instance, the party is regarded as a governmental actor sufficient to apply constitutional standards. Finding this, the court must examine the nature of the property that the potential speaker desires to use. A potential speaker's rights depend in part, upon the type of government property that the speaker seeks to access. *See Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

The traditional public forum, typically defined as an area like a sidewalk or a park, has traditionally been used for expressive activity. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55. The designated public forum is defined as an area that the government has dedicated to use by the public as a place for expressive activity or, in some cases that area that may be opened generally for all expressive activity. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In some cases, designated public forums have existed for more limited purposes, i.e. use by certain groups. *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Whether a public forum is traditional or designated, the restrictions on the governmental entity are the same. That entity may only enforce exclusions of speech that are content-based, if there is a showing that the restriction is necessary to serve a compelling state interest and if the exclusions are narrowly drawn to achieve that end. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–56. The third type of forum, a nonpublic forum, only requires that restrictions on speech be reasonable and not discriminate on the basis of viewpoint. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–56.

At the outset, the record simply does not support the conclusion that defendant's property is a traditional public forum or a nonpublic forum. It is unnecessary for us to analyze the applicability of either doctrine to plaintiffs' alleged constitutional deprivations presently before this court. First, there is no indication that the government has defined Navy Pier as an area designated

as one traditionally used for expressive activity. Further, as discussed later, there is a sufficient nexus between defendant's property and the government that prevents us from rendering defendants a private institution.

■ This determination requires us to examine the government's intent in its establishment and maintenance of the property. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448. This inquiry is not merely a matter of deference to defendant's stated purpose. Instead, we examine two factors to determine intent: (1) the policy and practice of the government with respect to the property and (2) the nature of the property and its compatibility with expressive activity. *Air Line Pilots Association, International v. Department of Aviation of the City of Chicago*, 45 F.3d 1144, 1151 (7th Cir.1995).

■ First, our examination of the government's intent requires a factual inquiry into its policy and practice. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448. Because it is virtually impossible to identify a public forum by legal inquiry alone, a district court is required to develop findings on matters such as the forum's past uses, and the government's consistent policy and practice. *Air Line*, 45 F.3d at 1152. This inquiry is one that should not be resolved without due attention to an underlying record. *Air Line*, 45 F.3d at 1152. By doing this, we avoid giving deference to the dangers of post-hoc policy formulation or to the discretionary enforcement of an effectively inoperative policy. *Air Line*, 45 F.3d at 1153. In other words, the government cannot "create" a policy to implement its newly-discovered desire to suppress a particular message nor invoke an otherwise unenforced policy to justify that suppression. *Air Line*, 45 F.3d at 1153. We must review the entire record to make sure that we are not deceived by such a policy.

■ "If a state wishes to rely on a 'policy' to demonstrate that it has not in fact opened a channel for expressive communication, however, that policy must be something more than a strategy adopted or relied upon for the purposes of litigation. A stated or paper policy, without more, does not negate public forum status". *Air Line*, 45 F.3d at 1153.

■ If we find that our review of the government's policy and practice leads us to conclude that this forum has indeed been designated for expressive activity, we are then required to determine whether the forum at issue is compatible with expressive activity. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448. If there is any indication that the proposed type of expression is incompatible with the purpose of the forum, that factor would indeed be relevant. *Air Line*, 45 F.3d at 1156. Our circuit, however, has drawn a very distinct line—mere objection to the "incompatibility" of a proposed message is not a permissible basis for avoiding public forum status. *Air Line*, 45 F.3d at 1157.

■ Thus, our mission is clear. As a district court, we are charged to focus primarily on the practice and past policy of defendant's property in order to determine if it, indeed, operated for all intensive purposes as a designated public forum. *Air Line*, 45 F.3d at 1157. If this court finds past policy and practice inconclusive, it must also examine, whether the type of expression is incompatible with the nature of the property. *Air Line*, 45 F.3d at 1157. After examination of these two factors, we can then conclude whether defendant's property is a designated public forum. *Air Line*, 45 F.3d at 1157. If we reach this determination, defendant's restrictions must fail unless they can conclude that their limit on political speech is narrowly tailored to meet a compelling state interest. *Air Line*, 45 F.3d at 1157.

## ANALYSIS

■ The Metropolitan Pier and Exposition Authority Act, enumerated in 70 ILCS 20/1, *et seq.*, provides that the Metropolitan Pier and Exposition Authority is created as a political subdivision, a unit of local government with "only those powers authorized by law, body politic and municipal corporation". 70 ILCS 210/3 (1955). The statute itself enumerates powers given to the Authority, further supporting its existence as a governmental entity. For instance, 70 ILCS 210/13 authorizes the Authority with power to levy taxes for specific purposes. 70 ILCS 210/13 (1955). The Authority is also allowed to

exercise the right of eminent domain by condemnation proceedings. 70 ILCS 210/5f (1955).

Further, Illinois case law supports this conclusion. The case of *People ex rel. Coutrakon v. Lohr*, 9 Ill.2d 539, 138 N.E.2d 471 (1956) establishes that this act thus creates a municipal corporation, not a private corporation because the powers of the Authority are proprietary rather than governmental. Further, subsequent cases of the Illinois courts have found that the attorney general has standing under common law powers to assert claims on behalf of the state which relate to the Authority's contracts based on common-law fraud. *See People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill.2d 473, 180 Ill.Dec. 271, 607 N.E.2d 165 (1992). Thus, we can conclude that indeed defendant is a state actor that is subject to the requirements of the United States constitution.

■ Defendant's memorandum in opposition to plaintiff's motion for a temporary restraining order fails to specifically articulate defendant's position, but it seems to assert that defendants are indeed a private entity, not subject to constitutional restrictions. At the outset, let us establish that there is an absence of merit in this position. Defendant asserts that its operation of the Pier is not intended to be supported by tax dollars—lease and licensing fees are designed to cover all operating expenses at the Pier. Further, defendant asserts that they have a substantial interest in ensuring the commercial success of the Pier's tenants, because they depend on license and lease revenues. Let us say, very emphatically, that defendant cannot have its proverbial cake and eat it too. In other words, defendant cannot rely on the relationship it has with the city of Chicago and the state of Illinois to increase its overall profit and revenue while asserting that its commercial and recreational aspects are a purely private venture, in an effort to avoid the proper constitutional characterization and applicable standards under the First Amendment.

■ Illinois legislation has established and defined the Metropolitan Pier and Exposition Authority sufficient for us to conclude that it is an actor "with the authority of the state" sufficient for constitutional standards to apply. *See Sherman*, 8 F.3d at 1168. Further, we can conclude, without much analysis, that there is indeed a symbiotic relationship between defendant and the State sufficient to support this conclusion. In the words of defendant, Navy Pier has become "one of Chicago area's principal tourist destinations". That is, as the defendant is commercially successful, the City of Chicago and the State of Illinois are also successful—that is, these entities are in close association and may prove to "be of benefit to each other" in the future. *See Burton*, 365 U.S. at 721, 81 S.Ct. at 859–60.

■ Concluding this, we can now address the nature of defendant's property. As already mentioned, our determination process to conclude that defendant's property is indeed a designated public forum requires us to, first, examine the policy and practice of defendant.

Navy Pier was constructed in 1916 and owned by the City of Chicago. The Pier was originally built to be several things, but it was largely a freight, passenger boat and ship port. At the east end of the Pier, the ballroom and related buildings were used primarily for entertainment. However, during World War I and World War II, the Navy took over the Pier and used it as a training ground. After the war, in response to the GI Bill, the University of Illinois moved into the Pier and operated the Pier as a campus until the mid 1950's, when the City took it over again.

At that same time, the St. Lawrence Seaway project was being completed in the hope that Chicago would become a major port. In approximately 1955–56, the south dock of Navy Pier was added at that time to encourage shipping. Although the St. Lawrence project never lived up to its billing, Lake Calumet Harbor was developed and shipping since that time has gone there.

In 1989, the state legislature amended the act of what had been the Metropolitan Fair & Exposition Authority, which historically operated McCormick Place, and gave the Authority power to operated the Navy Pier. The city then transferred the Pier to the

authority by deed. Between 1989 and 1995, the Authority expended over $200 million dollars to renovate Navy Pier.

Reopened in June 1995, the Pier now includes specialty shops, restaurants, a movie theater, an outdoor stage, a children's museum and recreational attractions, such as a ferris wheel in the summer and an ice skating rink in the winter. Along the south side of the Pier, a number of commercial passenger vessels exist, including tourist and dinner cruise boats.

With respect to the Pier's stated objective of operating the Pier as a commercial venture, Pier management has instituted various policies to ensure that visitors encounter "a pleasant atmosphere conducive to shopping, dining and other commercial and recreational operations of the Pier's tenants". Defendants allege that they have enforced a two-fold policy consistently since 1995 which addresses expressive conduct in the public areas of the Pier. In order to engage in expressive conduct on the Pier, a speaker must satisfy two conditions: (1) that speaker must be a tenant or other licensee and (2) that conduct must be in furtherance of the commercial purpose of the Pier either by promoting the lessee's business or, in the case of hired performers, by providing entertainment for visitors to the Pier and thereby making the Pier an attractive alternative to a shopping mall. Non-tenants are prohibited from engaging in any type of solicitation, demonstration, leafletting and protesting on Navy Pier without their permit application being approved.

Policy requires a non-tenant to utilize the procedure which requires the organization or individual to fill out a permit. In some cases, individuals can fill out the permit and proceed with their demonstration upon its completion. In any instance, no commercial solicitation, advertisement or related activity is permitted at Navy Pier or Gateway Park without a valid lease or license from the MPEA, both of which require application and qualification pursuant to published procedures.

Navy Pier's "Pier Wide Policies and Procedures", assumedly created on June 21, 1995,

provides the following in subsection 16, on Pg. 7, with regard to public demonstrations:

*Public demonstrations are prohibited unless there is a permit granted by Navy Pier Management. Upon approval, the demonstration may occur only at the time, place and manner authorized by management.*

With regard to literature distribution, subsection 12, Pg. 6 provides the following:

*Distribution of flyers, handbills or any free publications is prohibited without the written permission of Navy Pier Management. Upon approval, distribution of these materials will occur at the time, place and manner designated by management.*

The permit asks for relatively simple information: name, date, address, phone number, dates and times of request, type of activity and number of persons participating at any one time. Above the signature line, a paragraph essentially requires the signatory to abide by the Navy Pier Rules and Regulations, a copy of which is provided with the application. Further, the signatory is required to be subject to permit conditions. That is, activities must take place with the designated area south and west of Navy Pier's Dock Street entrance. Permitholders are not allowed to deface MPEA or other public or private property at Navy Pier or in Gateway Park. In the event that it is necessary to "avoid traffic congestion, for health or safety reasons or to accommodate construction operations", MPEA may require movement to another area of equivalent size.

Witness Reilly testified that the Pier has always believed that political activity was improper on the Pier because it interfered with its commercial uses. However, Reilly added that defendant has always believed that it had an obligation to make reasonable accommodations with people who wanted to express their views. Therefore, whether individuals actually show up to the Pier or whether they call in advance, they will be told about the Navy Pier policy.

Reilly did not directly articulate whether the policy was written or oral but asserted that a general reference to the policy exists

in the Pier policy manual. Reilly conceded that many of the details have been "worked out" to amplify the general policy between the general manager, the current director of security, the general counsel of the authority and himself. It is in this vein that the Pier's articulated policy becomes problematic. First, "as far as he knows", the permit policy and procedure has been followed on every occasion. This contradicts the stringent application of the policy which defendant has proffered in its opposition pleading. "[T]o his knowledge", Reilly testified that the Pier has never denied a permit. Yet, of his own knowledge he could not articulate specific examples of protestors or demonstrators in the last year who have been met on the Pier and asked to fill out such permits. On cross, Reilly admitted that there are no standards governing his discretion as to which handbills, solicitations and public demonstrations are granted and which are denied. The existing policy allows public demonstrations to be prohibited unless management allows them—it is up to their total discretion. Worst, there are no time limits within which the Navy Pier management is required to deny or grant a permit application.

*Air Line Pilots Association, International v. Department of Aviation of the City of Chicago*, 45 F.3d 1144, 1151 (7th Cir.1995) directly addresses this ambiguity. A government entity cannot "create" a policy to implement a "newly discovered desire" to suppress a particular message nor invoke an otherwise unenforced policy to justify that suppression. *Air Line*, 45 F.3d at 1153. Again, a stated or paper policy, without more, does not negate public forum status. *Air Line*, 45 F.3d at 1153.

The history of the Navy Pier clearly establishes strong ties to both the state of Illinois and the City of Chicago, notwithstanding the recent legislative enactment of the Metropolitan Pier and Exposition Authority Act. Further, the record contains sufficient evidence and history of the Pier for us to conclude that it indeed is a governmental actor. Although defendant's have proffered their stated policies and procedures in an effort to claim private status and avoid constitutional muster, we are not convinced. The record simply does not support consistent enforcement of defendant's policy. Although it was not an essential factor in our determination, plaintiffs' assertions that defendant has sanctioned activities with various non-profit and charitable entities raises our suspicions as to the position that defendant asserts. Even if we had found the past policy and practice inconclusive, we find that the type of expression plaintiffs seek is not incompatible with the nature of a commercial and recreational center, such as this, which welcomes the public for the purposes of shopping, dining and entertainment. *See Air Line*, 45 F.3d at 1157. Based on the record, we are led to conclude that the past practice and policy of this governmental entity supports our conclusion that defendant is indeed intended to be a channel for expressive communication sufficient to be a designated public forum.

■ Accordingly, we confront the last issue in the analysis for First Amendment purposes. That is, it is now necessary for us to determine whether defendant's proposed restrictions on plaintiffs' speech are a valid regulation of time, place and manner. Although it is certain that plaintiffs' requests only address defendant's property, Navy Pier, it is also certain upon reflection, that the characteristics and elements of these two events are sufficiently distinct that we address each date separately.

As an initial matter, this court takes judicial notice of the unique circumstances that this case raises by virtue of the existence of the Democratic National Convention's presence. We would be remiss not to acknowledge the potential impact that such an event has on the safety and protection of the general public visiting Navy Pier, notwithstanding the expected number of governmental dignitaries and officials.

■ We are not led to conclude that the protestors are inherent security problems just by virtue of their status as protestors. Ms. Talbot, field director for ACORN, credibly testified that plaintiffs' interest is not to disrupt the activities at Navy Pier on either date. Instead, she asserted that plaintiffs' interest is solely to convince the Mayor to "come to the negotiating table about developing a Living Wage Ordinance that the city

can live with and that we can live with. If we disrupt, if we do anything beyond attracting enough attention to our issue to get the mayor to the table, we will make it very difficult, indeed, to ever reach resolution". And, even though John Donahue, a member of the Chicago Coalition for the Homeless, admitted that his organization had participated in a demonstration to attract the attention of Mayor Daley which involved the participants boarding the elevators on the first floor of Daley center and holding the doors open on the seventh floor for almost 30 minutes, we are again not convinced that the protestors in and of themselves present a substantial security risk.

■ Yet, the defendant's have presented substantial, unrebutted testimony from some of Chicago's top individuals in crime and arson prevention.

Defense witness Vincent Joseph Gavin, director of security at Navy Pier, was a Chicago policeman in the late 1960's. Gavin has been trained at the Chicago Police Academy, is a graduate of the United States Secret Service Academy and the FBI Academy. He has extensive security experience dealing with crowd control in civil disorders, demonstrations, parades and festivities. Further, he has shopping mall experience, which is also relevant to the property that is before us.

Defense witness James Allen Maurer is currently employed by the Chicago Police as a deputy chief in charge of patrol of Area 3. In this position, Maurer oversees five districts and approximately 2,000 police officers. Maurer has been working for the Chicago Police since 1964, again confirming significant experience and knowledge about crowd control, both violent and non-violent. As Deputy Chief, Maurer's primary responsibility is the security of the Sheraton Hotel during the Democratic National Convention. During the convention, the Sheraton Hotel will house the White House staff, the cabinet, various senators and representatives, the first family and the second family, the Vice–President and the President. Further, Maurer has specifically been assigned to be in overall command of the operation of the media party including traffic control, outside security and the posting of officers to Pier sites.

Defendant's last witness, John P. Kennedy, is the commander of the Bomb and Arson Section of the Chicago Police Department. Kennedy also possesses a significant level of expertise, as he has been employed by the Department for twenty-nine years. In his position, Kennedy commands an element of the Detective Division that is responsible for investigating all bombing incidents in the city. Again, Kennedy possesses significant experience in crowd control—he had an instrumental role with respect to security during the Pope's visit to Chicago, the opening of Comiskey Park and other significant Chicago events which drew recordbreaking numbers.

Perhaps the most appropriate statement which addresses the balancing required by the First Amendment, specifically with respect to this event, comes from Deputy Chief Maurer:

> Honestly, I don't believe that the protestors would present by themselves as a group any more of a security threat than anyone else, but that's an interesting problem that we have to face. Many times, you'll have individuals—this is an event that has been planned for year. People know that the Democratic Convention is going to be here. And it wouldn't be a far stretch to assume that they're going to be in places like Navy Pier, just as we're making plans at the Sheraton.

> This is an ideal situation for someone who wanted to cause a problem for the president or the vice-president to use any gathering, whether it be protest or large groups, to cause an incident and create a lot of problems.

■ Let us say, in closing, that we are convinced by the combined testimony of these individuals which emphasized the unique architectural structure of Navy Pier, and the impact of such a structure in the event of emergency evacuation. As a court existing in this modern day, we are not given the luxury of perceiving terrorist threats nor related matters as impossibilities. Further, we think that a balancing test which recog-

nizes and considers modern day realities is in keeping with constitutional muster. As an initial matter, let us say that plaintiffs' requests to have their message placed on the boats in the harbor have been denied on both dates, since the evidence adduced at the hearing revealed that the Pier Authority has no jurisdiction on the waterways. We find the following restrictions with regard to plaintiffs' proposed dates of August 24, 1996 and August 27, 1996 are justified without reference to the content of the regulated speech, ... are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for the communication of the information. *See International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 701–05, 112 S.Ct. 2711, 2720–21, 120 L.Ed.2d 541 (1992).

## II. The appropriateness of injunctive relief

 A party is entitled to preliminary injunctive relief or a temporary restraining order if it can establish: (1) a likelihood that the party will succeed on the merits; (2) that it will suffer irreparable harm in the absence of injunctive relief; (3) that the balance of harms weighs in its favor; and (4) that issuance of the decree would not adversely affect the public interest. *International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988).

 We find that plaintiffs' have demonstrated that they have a "better than negligible" chance of succeeding on the merits to justify injunctive relief. *See International Kennel,* 846 F.2d at 1084. Further, violations of constitutional rights, including violations of the First Amendment, are deemed "irreparable harm" for purposes of injunctive relief. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976). In this case, plaintiffs are more likely to suffer harm if the injunction is denied, than the defendant if the injunction is granted. Last, the public has a powerful public interest in constitutional rights, particularly the right of citizens to speak, petition and demonstrate. *See O'Brien v. Town of Caledonia,* 748 F.2d 403, 408 (7th Cir.1984); *Spartacus Youth League v. Board of Trust-*

*ees of Illinois Industrial University,* 502 F.Supp. 789, 804–05 (N.D.Ill.1980).

Thus, we conclude a temporary restraining order is appropriate in this case in accordance with the specific directions we have provided.

Therefore, plaintiff's motion for a temporary restraining order is granted as provided below:

### I. August 24, 1996

Plaintiffs will be allowed to congregate specifically in the following areas:

— Twenty five demonstrators will be allowed to protest in the park immediately south of the south dock entrance.

— Ten demonstrators will be allowed to protest in the park at the north end, at the bus drop-off point.

— A total of twenty demonstrators will be allowed to occupy the area from the south end of Family Pavilion to the north side of south sidewalk and the area immediately to the south of south sidewalk (Dock Street). The demonstrators will be placed along Dock Street according to the discretion of Pier Authority.

— Five demonstrators will be allowed at each bus drop-off point along the north side of the Pier.

— An unlimited amount of protestors may demonstrate in Gateway Park.

— No demonstrators will be allowed to protest inside of the Navy Pier Mall building nor protest at the north doors to the Family Pavilion.

— At each place where protestors are placed, they are allowed to distribute leaflets and engage in dialogue with any individual who desires to obtain additional information about the Living Wage Ordinance.

— In order for the protestors to demonstrate, the Pier Authority, if they so desire, may provide credentials for them in the interest of security.

— Singing, chanting, the use of electronic amplification or group circular movement of individual protestors will not be allowed during the course of protest in any area.

II. August 27, 1996

— Twenty five demonstrators will be allowed to be protest in the park immediately south of the south dock entrance.

— Twenty demonstrators will be allowed to protest in the park at the north end, at the bus drop-off point.

— A total of forty demonstrators will be allowed to occupy the area from the south end of Family Pavilion to the north side of south sidewalk and the area immediately to the south of south sidewalk (Dock Street). The demonstrators will congregate in four groups of ten individuals. There is to be no movement of these groups. Instead, the groups are to remain stationery consistent with their corresponding right to access to the individuals. Further, the Pier Authority may employ its discretion to place these demonstrators along Dock Street, as long as this does not significantly impede their right to access.

— Five demonstrators will be placed at each bus drop-off point along the north side of the Pier.

— Five demonstrators will be allowed to protest in front of the north doors at the Family Pavilion.

— An unlimited amount of protestors may demonstrate in Gateway Park.

— No demonstrators will be allowed to protest inside of the Navy Pier Mall building.

— At each place where protestors are placed, they are allowed to distribute leaflets and engage in dialogue with any individual who desires to obtain additional information about the Living Wage Ordinance.

— In order for the protestors to demonstrate, the Pier Authority, if they so desire, may provide credentials for them in the interest of security.

— Singing, chanting, the use of electronic amplification or group circular movement of individual protestors will not be allowed during the course of protest in any area.